2016 – 2433, 2016 – 2514

_____

### *In the United States Court of Appeals for the Federal Circuit*

METALCRAFT OF MAYVILLE, INC.,

dba SCAG POWER EQUIPMENT,

*Plaintiff-Appellee*

v.

THE TORO COMPANY

and

EXMARK MANUFACTURING CO., INC.,

*Defendants-Appellants*

_____

Appeals from the United States District Court for the Eastern District of Wisconsin in Case No. 2:16-CV-00544

_____

### Corrected Defendants-Appellants' Opening Brief

_____

Anthony R. Zeuli
Rachel C. Hughey
MERCHANT & GOULD PC
3200 IDS Center
80 South Eighth Street
Minneapolis, MN 55402
(612) 332-5300

*Attorneys for Defendants-Appellants The Toro Company and Exmark Manufacturing Co., Inc.*

September 14, 2016

## CERTIFICATE OF INTEREST

Counsel for Defendants-Appellants The Toro Company and Exmark Manufacturing Co., Inc., certifies the following:

1.     The full name of every party or amicus represented by me is:

The Toro Company and Exmark Manufacturing Co., Inc.

2.     The name of the real part in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The Toro Company, hereby states that it has no parent corporation and that

no publicly held corporation owns 10% or more of its stock.

Exmark Manufacturing Co., Inc., hereby states that it is a wholly owned

subsidiary of The Toro Company, which has no parent corporation and with no

publicly held corporation owning 10% or more of its stock.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Anthony R. Zeuli, Thomas J. Leach, Rachel C. Hughey, Shane A. Brunner, Stephen R. Howe, MERCHANT & GOULD PC

September 14, 2016                    s/ Rachel C. Hughey
                                      Rachel C. Hughey
                                      *Attorney for Defendants-Appellants*
                                      The Toro Company and Exmark
                                      Manufacturing Co., Inc.

2

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST .................................................................2

TABLE OF AUTHORITIES .................................................................6

STATEMENT OF RELATED CASES .................................................10

JURISDICTIONAL STATEMENT ......................................................11

STATEMENT OF THE ISSUES...........................................................12

STATEMENT OF THE CASE ..............................................................14

I.    Introduction...................................................................................14

II.   Background....................................................................................15

      A.    Scag told the PTO that the prior art did not support the entire
            body of the operator. .........................................................15

      B.    Scag's solution supported the entire body of the operator by
            mounting the seat, footrest and steering controls on the
            suspended operator platform, isolating the entire operator from
            shock loads. .......................................................................19

      C.    Toro's mowers do not support an entire body of the operator
            during use of the vehicle because the steering controls are
            mounted on the chassis, not the suspended operator platform............24

      D.    The district court erroneously construed "an entire body of an
            operator" to exclude the operator's hands and arms, rejected
            Toro's invalidity arguments in one sentence each, and granted
            an overbroad preliminary injunction. ................................25

SUMMARY OF THE ARGUMENT ......................................................28

ARGUMENT .........................................................................................30

I.    The preliminary injunction should be reversed because the claims
      mean what they say: "an entire body." Not a portion. Not just the
      torso and feet. Scag chose this limitation and must live with it. ..................33

A.    The court's construction "in reference to how one sits in an ordinary chair" is contrary to the plain meaning and at odds with the specification. ........................................................................33

    1.    The plain meaning requires that the operator platform support the operator's hands and arms during use of the vehicle. ..................................................................................34

    2.    Scag distinguished prior art that transmitted shock loads to the operator through non-suspended components and explained that its claimed platform supports "an entire body of the operator." ...........................................................37

    3.    Claim differentiation does not save Scag's claims because the doctrine does not apply here and is easily overcome. ................................................................................44

B.    Scag cannot use claim construction to reclaim that which it disclaimed. ........................................................................47

II.    The preliminary injunction should be reversed because, after denying discovery, the district court rejected anticipation and obviousness defenses in a single sentence each. ..............................................49

A.    The district court did not construe "operator platform" before finding that Henriksson does not disclose one as claimed in '475 patent claims 11 and 14. ...........................................50

B.    In rejecting a motivation to combine Henriksson and Sasaki for claim 21, the district court ignored that the prior art taught the same problem and suggested the same solution. ...................................55

III.    The district court disrupted the status quo by elevating competition over Toro's and the public's harms. ...........................................59

A.    Toro will be severely harmed if the injunction is not reversed and Scag's harm is compensable. .........................................59

B.    Toro's legitimate design-around efforts favor reversal. .....................62

C.    Scag's delay of almost one year in seeking a preliminary injunction should not disrupt the status quo. ......................................63

IV.    At a minimum, the preliminary injunction should be vacated and
       remanded because it is vague and overbroad. ...............................................64

CONCLUSION .................................................................................................65

ADDENDUM ....................................................................................................67

PROOF OF SERVICE .......................................................................................68

CERTIFICATE OF COMPLIANCE ...................................................................69

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs. v. Andrx Pharms., Inc.*,
452 F.3d 1331 (Fed. Cir. 2006) ........................................................60

*Amazon.com v. Barnesandnoble.com*,
239 F.3d 1343 (Fed. Cir. 2001) ...............................................53, 59

*Andersen Corp. v. Fiber Composites, LLC*,
474 F.3d 1361 (Fed. Cir. 2007) ........................................44, 45, 48

*Apple v. Samsung*,
816 F.3d 788 (Fed. Cir. 2016) ......................................................58

*AstraZeneca v. Apotex*,
633 F.3d 1042 (Fed. Cir. 2010) ....................................................63

*Automated Merch. v. Crane*,
357 Fed. Appx. 297 (Fed. Cir. 2009)........................................59, 60

*Bicon v. Straumann*,
441 F.3d 945 (Fed. Cir. 2006) ......................................................37

*Brown v. 3M*,
265 F.3d 1349 (Fed. Cir. 2001) ....................................................54

*Celgard v. LG Chem.*,
624 Fed. Appx. 748 (Fed. Cir. 2015)........................................32, 59

*Chamberlain v. Lear*,
516 F.3d 1331 (Fed. Cir. 2008) ....................................................33

*Chef Am. v. Lamb-Weston*,
358 F.3d 1371 (Fed. Cir. 2004) ....................................................40

*Cias v. Alliance Gaming*,
504 F.3d 1356 (Fed. Cir. 2007) ....................................................54

*David Netzer Cons'g Eng'r v. Shell Oil*,
824 F.3d 989 (Fed. Cir. 2016) ......................................................48

*Entegris v. Pall,*
    490 F.3d 1340 (Fed. Cir. 2007) .........................................................31

*GPNE v. Apple,*
    2016 U.S. App. Lexis 13862 (Fed. Cir. Aug. 1, 2016).......................45

*High Tech Medical v. New Image,*
    49 F.3d 1551 (Fed. Cir. 1995) ...................................................32, 59

*Int'l Rectifier v. IXYS,*
    383 F.3d 1312 (Fed. Cir. 2004) .........................................................65

*IP v. eCollege.com,*
    156 Fed. Appx. 317 (Fed. Cir. 2005)..................................................42

*K-2 v. Salomon,*
    191 F.3d 1356 (Fed. Cir. 1999) .........................................................34

*KSR v. Teleflex,*
    550 U.S. 398 (2007)..................................................................30, 58

*Lear v. Adkins,*
    395 U.S. 653 (1969)...........................................................................62

*Luminara Worldwide v. Liown Elecs.,*
    814 F.3d 1343 (Fed. Cir. 2016) ...................................31, 32, 47, 48

*Masimo v. Mallinckrodt,*
    18 Fed. Appx. 852 (Fed. Cir. 2001)...........................................38, 41

*Multiform Desiccants v. Medzam,*
    133 F.3d 1473 (Fed. Cir. 1998) .........................................................44

*Mycogen Plant Sci. v. Monsanto,*
    243 F.3d 1316 (Fed. Cir. 2001) ...................................................44, 45

*Nat'l Steel v. Can. Pac.,*
    357 F.3d 1319 (Fed. Cir. 2004) ...............................................30, 32, 49

*Novo Nordisk v. Genentech,*
    77 F.3d 1364 (Fed. Cir. 1996) .........................................................31

*Nutrition 21 v. United States*,
    930 F.2d 862 (Fed. Cir. 1991) ............................................................64

*Nutrition 21 v. United States*,
    930 F.2d 867 (Fed. Cir. 1991) ...............................32, 53, 60, 63, 64

*O.I. Corp. v. Tekmar Co.*,
    115 F.3d 1576 (Fed. Cir. 1997) ........................................................39

*Oakley v. Int'l Tropic-Cal*,
    923 F.2d 167 (Fed. Cir. 1991) ..........................................................32

*PGH v. St. John*,
    469 F.3d 1361 (Fed. Cir. 2006) ...................................................31, 32

*Phillips v. AWH*,
    415 F.3d 1303 (Fed. Cir. 2005) ........................................................37

*Retractable Techs. v. Becton*,
    653 F.3d 1296 (Fed. Cir. 2011) ...................................................44, 45

*Robert Bosch v. Pylon*,
    659 F.3d 1142 (Fed. Cir. 2011) ...................................................60, 61

*Sciele Pharma v. Lupin*,
    684 F.3d 1253 (Fed. Cir. 2012) ...........................................31, 49, 55

*SciMed Life Sys. v. Adv. Cardiovascular Sys.*,
    242 F.3d 1337 (Fed. Cir. 2001) ........................................................48

*Seachange v. C-COR*,
    413 F.3d 1361 (Fed. Cir. 2005) ........................................................44

*Secure Web v. Microsoft*,
    640 Fed. Appx. 910 (Fed. Cir. 2016)................................................38

*Smith v. Hughes*,
    718 F.2d 1573 (Fed. Cir. 1983) ........................................................62

*T.J. Smith & Nephew v. Consol. Med. Equip.*,
    812 F.2d 646 (Fed. Cir. 1987) ..........................................................64

*Tivo v. Echostar*,
    646 F.3d 869 (Fed. Cir. 2011) ........................................................... 62

*Toro v. White*,
    199 F.3d 1295 (Fed. Cir. 1999) ......................................................... 40

*Vascular Sol'ns v. Boston Sci.*,
    562 Fed. Appx. 967 (Fed. Cir. 2014).................................................. 32

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 (Fed. Cir. 2007) ......................................................... 47

*Winter v. NRDC*,
    555 U.S. 7 (2008)...................................................................... 31, 59

**Statutes**

28 U.S.C. § 1292 .................................................................................. 11

28 U.S.C. § 1331 .................................................................................. 11

28 U.S.C. § 1338 .................................................................................. 11

35 U.S.C. § 103 .................................................................................... 57

**Other Authorities**

Fed. R. App. P. 32 ................................................................................ 69

Fed. R. Civ. P. 65 ................................................................. 13, 30, 64, 65

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5(a), there is no other appeal in or from the same civil action or proceeding in the lower court that was previously before this or any other appellate court. Pursuant to Federal Circuit Rule 47.5(b), there are no cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. §§ 1331 and 1338. This Court has jurisdiction under 28 U.S.C. § 1292(a).

The district court issued a decision granting Scag's motion for a preliminary injunction on August 1, 2016. (Appx6-18.) Toro timely filed a notice of appeal on August 4, 2016. (Appx470-471.) Toro then timely moved to stay the preliminary injunction pending appeal on August 11, 2016. (Appx472-476.) The district court denied Toro's request for a stay of the preliminary injunction, set a bond, and entered the preliminary injunction on August 18, 2016. (Appx19-27.) Toro timely filed a notice of appeal on August 19, 2016. (Appx535.) This Court has jurisdiction over the district court's interlocutory orders granting a preliminary injunction. 28 U.S.C. § 1292(a).

## STATEMENT OF THE ISSUES

1.　　Scag criticized prior art suspended operator platforms with steering controls mounted to the chassis because they did not support the entire body of the operator, as shock loads were transmitted "through the steering levers and into the arms of the operator." All asserted claims include the limitation of "an operator platform that supports . . . an entire body of an operator during use of the utility vehicle." The district court construed this limitation "in reference to how a person sits in an ordinary chair" which it found meant "an entire body of an operator" does not include the operator's hands/arms. Toro's mowers have controls mounted to the chassis that do not support the hands and arms. Did the district court err as a matter of law in its construction and thus abuse its discretion in granting a preliminary injunction that removed Toro's mowers from the marketplace?

2.　　Toro demonstrated that under either construction, claims 11 and 14 are anticipated by Henriksson, which discloses a vehicle with a suspended operator platform. Toro also demonstrated that, consistent with *KSR*'s mandate that a person of skill is "a person of ordinary creativity, not an automaton," claim 21 is obvious in view of Henriksson and Sasaki, which discloses the claimed shocks. The district court rejected each defense in a single sentence of analysis, finding for anticipation that Henriksson is directed to a "heavy-duty truck," which the court determined meant it lacked an "operator platform," though the court never construed that

12

limitation. For obviousness, the court concluded a person of skill in the art would not combine a motorcycle shock with a suspended truck cab. Did the district court misapply law and clearly err in granting a preliminary injunction that removed Toro's mowers from the marketplace?

3.    Scag delayed almost a year in seeking a preliminary injunction and acknowledges that it can be compensated financially for any loss of sales. In considering irreparable harm, balance of hardships, and public interest, the district court relied on permanent injunction case law and found that there would be a "substantial hardship" on Scag because "Scag would be forced to 'compete against its own patented invention,'" something all practicing patentees can argue. Did the district court err as a matter of law and make a clear error of judgment in weighing relevant factors in granting a preliminary injunction that removed Toro's mowers from the marketplace?

4.    Rule 65(d) requires injunctions state their terms specifically, and this Court rejects injunctions that "simply prohibit[] future infringement of a patent" by vaguely barring "infringement by 'any device covered by one or more of Claims []' of the [] patent." Did the district court err as a matter of law by granting an overly broad and vague injunction that enjoins Toro from "making, using, selling, and offering to sell lawnmowers equipped with platform suspension systems that infringe Scag's patent, U.S. Patent No. 8,186,475"?

## STATEMENT OF THE CASE

### I.    Introduction

This case about riding lawn mowers is remarkable because the district court construed "an entire body of an operator" as not including the operator's hands and arms. The court found the feet and torso to be included, though. There is no justification for excluding the hands and arms. The claims mean what they say: "an entire body." Not a portion. Not just the torso and feet.

This case is also remarkable because, after denying discovery, the district court rejected anticipation and obviousness defenses in a single sentence each. The court did not construe "operator platform," the only element it found lacking in the prior art. In rejecting obviousness for no motivation to combine, the court ignored that the prior art taught the same problem and suggested the same solution.

This case is also remarkable because the district court disrupted the status quo by elevating competition over defendants' and the public's harms and removed products from the market with a vague preliminary injunction that prohibits future infringement of a patent.

This is a garden variety patent infringement suit between two large lawn mower manufacturers. It is remarkable for the errors the district court made in granting a preliminary injunction. It is not, however, the rare case where a preliminary injunction taking products off the market should be granted.

## II.    Background

Ride-on lawn mowers and other off-road light utility vehicles generally employ a "rigid chassis," meaning the vehicle chassis does not have a suspension system. (Appx28, Abst.) This is in contrast to a car, where the chassis is usually suspended from the wheels, often by shock absorbers and/or springs. (Appx41, 1:61-66.) Ride-on mowers typically do not have a car-type suspension because those suspensions are complex, expensive, and require substantial maintenance. (Appx41, 1:66-2:1.) They also reduce cutting performance. (Appx41, 2:4-10.) Without a suspension system, though, operators of ride-on mowers and other light utility vehicles that travel across uneven terrain can experience uncomfortable shocks, called "shock loads," that come from the rigid chassis. (Appx41, 1:14-18.) The prior art is replete with inventions designed to reduce shock loads to these operators.

### A.    Scag told the PTO that the prior art did not support the entire body of the operator.

In the Background of the Invention of the patent-in-suit, assignee Metalcraft of Mayville, Inc. d/b/a Scag Power Equipment ("Scag") described what it saw as the problem with the prior art. Prior art ride-on mowers exposed operators to shock loads from the rigid chassis transmitted through components in contact with the operator—the footrests, seats, and steering controls:

15

Operators of ride-on mowers can mow for relatively long periods of time, since the operators are seated during use. Despite being seated while mowing, operating ride-on mowers can be physically demanding because the operators can be exposed to shocks, vibrations, or other loads, that are generated by the ride-on mower during use or that result from driving the ride-on mower across uneven terrain. Such vibrations, or shock-type or other loads, can transmit through the ride-on mower chassis, foot rest, seat, and controls, and into the legs, bodies, and arms of the operators.

(Appx41, 1:12-21.)

Scag acknowledged that prior art ride-on mowers made attempts at reducing these shock loads to operators by suspending[1] various components in contact with the operator from the chassis. (Appx41, 1:25-28.) Prior art "suspension seats" (like used on buses) used springs and/or dampeners to suspend only the seat from the chassis. (Appx41, 1:25-28.) Scag criticized these suspended seats because they did not isolate the operator from receiving shock loads transmitted from the rigid chassis through the non-suspended footrests and controls: "seat suspensions leave operators susceptible to exposure of shock loads through foot rests, controls, or components *other than the seat* that are in contact with the operator." (Appx41, 1:30-33 (emphasis added).)

---

[1] As the patent-in-suit recognizes, "suspend" means components can be attached above or below the chassis to isolate the components. (Appx41, 1:25-28.)

Scag described another prior art mower, U.S. Patent Application Publication

No. 2008/0202874[2] ("Scheele"), that "partially alleviate[d]" the shock load

problem by providing an "operator platform isolation system," which suspended

the operator footrest from the chassis in addition to the seat. (Appx41, 1:34-38;

Appx345.) But Scheele's steering controls were not suspended from the chassis,

they were mounted to it. (Appx41, 1:34-38, 1:50-53.) Scag criticized Scheele

because the operator was still not isolated from shock loads because they were

being transmitted to the operator's arms through the steering controls mounted on

the rigid chassis: "[m]ounting the steering levers directly to the chassis allows

vibrations, or shock-type or other loads, which are transmitted through the chassis,

*to also be transmitted through the steering levers and into the arms of the*

*operator*." (Appx41, 1:34-60 (emphasis added).) Scag further criticized Scheele

because mounting the steering controls on the chassis caused an undesirable

"meandering feel during use." (Appx41, 1:56-60.)

In Scheele (image below), which is assigned to Husqvarna, the operator

platform (12) (green) is suspended by a suspension system (40) (yellow) from the

vehicle chassis (2) (blue). (Appx347 (color added); Appx357, [0023]; Appx345.)

The operator seat (14) (pink) is mounted on and supported by the suspended

---

[2] The patent-in-suit cites the correct publication number on its face, but has a typo
in the body, which refers incorrectly to U.S. Patent Application Publication No.
2006/0290080. (Appx41, 1:34.) The typo is not in dispute.

operator platform, which includes a front portion for an operator footrest.

(Appx347; Appx357, [0022] – [0023].) The steering levers (22) (red) are mounted

on the chassis, not the suspended operator platform. (Appx347; Appx357, [0022] –

[0023].)



(Appx347 (color and labels added).) Sheele's operator platform suspended the seat

and footrest from the rigid chassis, supporting the operator's torso and feet and

legs. (Appx357, [0022]; A359, [0031].) The operator's hands and arms, however,

were supported by the chassis, to which the steering controls were connected, and

through which shock loads were transmitted to the operator. (Appx347; Appx41,

1:56-60.)

18

**B.    Scag's solution supported the entire body of the operator by mounting the seat, footrest and steering controls on the suspended operator platform, isolating the entire operator from shock loads.**

The patent-in-suit, U.S. Patent No. 8,186,475 ("the '475 patent") is assigned to Scag and teaches a suspended operator platform suspension system for off-road light utility vehicles, such as ride-on mowers, that reduces shock loads to the operator transmitted through the vehicle's rigid chassis. (Appx28, Abst.; Appx41, 1:5-8, 2:25-30; Appx42, 3:66-4:7.)

The operator platform is the portion of the vehicle that carries the operator. (Appx28, Abst.) It is suspended from the chassis (frame) of the vehicle, from which the shock loads are transmitted, by a suspension system. (Appx41, 2:49-51.) During use of the utility vehicle, the operator's hands and arms are used to operate the vehicle via steering controls. (Appx42, 4:38-41; Appx43, 5:1-32.)

Figure 2 from the '475 patent, colored for ease of explanation, shows the claimed invention. (Appx31.) It shows vehicle chassis (10) (blue), the suspension system (100) (yellow), the suspended operator platform (70) (green), the operator seat (60) (pink), and the steering controls (55) (red):



FIG. 2

(Appx31, fig. 2 (color added).) As shown in figure 2, the suspended operator

platform (70) is suspended from the vehicle chassis (10) by the suspension system

(100). (Appx42, 3:66-4:7) The operator controls the vehicle (both speed and

direction of movement) from seat (60) through the steering controls (55). (Appx42,

4:38-41; Appx43, 5:1-32.) The seat, steering controls, and footrest are all mounted

on the suspended platform, isolating the entire body of the operator, including

hands and feet, from shock loads transmitted through the vehicle chassis. (Appx43,

5:33-43, 6:7-22.) The entire body of the operator is supported by the suspended

operator platform; no part of the operator is in contact with any component

mounted on the chassis.

Figure 3 shows the claimed invention from another angle:



As shown in figure 3, the suspended operator platform (70) (green) carries the

operator seat (60) (pink). The operator platform is suspended from the vehicle

chassis (10) (blue) by angled, pivotal links (110, 120) (yellow). (Appx32; Appx43,

6:40-47, 6:62-7:10.)

All 11 drawings are different views of figure 1, which Scag described as

"the present invention." (Appx42, 3:25-27.) All drawings showing the steering

controls, including figure 1, show them connected to the platform. (Appx30-36.)

The specification never describes or shows steering controls connected to anything

other than the operator platform. (Appx43, 5:3-5.)

The specification makes clear that Scag's solution isolated the "entire operator, including the operator's hands and feet, from shock loads" by suspending from the rigid chassis an operator platform including not only the seat, but also the footrest and the steering controls. (Appx43, 6:20-22.) Having criticized and distinguished the prior art for failing to suspend components in contact with the entire body of the operator, such as footrests and steering controls (Appx41, 1:30-33, 1:56-60), Scag claimed that in its invention the "operator platform supports *an entire body of the operator . . . . Steering controls* of the ride-on lawn mower *are connected to the operator platform* so that the steering controls move with the operator platform and are suspended and/or isolated from the chassis." (Appx28, Abst. (emphasis added).) Scag also explained in the specification that its suspended operator platform supported "an *entire body* of the operator" during use of the utility vehicle because not only are the seat and feet/legs of the operator supported by the suspended operator platform, as in Scheele, but so too are the operator's arms supported because the "[s]teering controls of the vehicle are connected to the operator platform so as to move with the remainder of the platform." (Appx41, 2:51-54 (emphasis added).)

Each and every time Scag used the phrase "an entire body of the operator" in the specification, it described a platform supporting the operator's *entire* body,

including hands and arms, by connecting the steering controls to the platform, not

the chassis:

- "The operator platform supports *an entire body of the operator* and isolation mounts connect a seat assembly to the operator platform. *Steering controls of the ride-on lawnmower are connected to the operator platform so that the steering controls move with the operator platform and are suspended and/or isolated from the chassis*."

- "The operator platform supports *an entire body of the operator*. *Steering controls of the vehicle are connected to the operator platform so as to move with the remainder of the platform*."

- "Referring again to FIGS. 1 and 2, suspension system 100 is configured to support *an entire body of the operator*, *the operator platform 70, and the components attached to the operator platform 70 such as steering controls 55*…. This configuration of suspension system 100 enhances operator comfort by isolating *the entire operator, including the operator's hands and feet*, from shock loads."

(Appx28, Abst. (emphasis added); Appx41, 2:51-54 (emphasis added); Appx43,

6:7-22 (emphasis added).)

Scag chose to include as a limitation in all asserted claims that its suspended

operator platform not only supports the seat, but also supports "*an entire body of

an operator* during use of the utility vehicle." (Appx46-47, claims 11, 14 & 21

(emphasis added).) Claim 11, for example, sets forth the following:

> 11. A riding utility vehicle, comprising:
> a chassis that supports a drive train;
> a seat;
> *an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle*;

a suspension system connecting the operator platform to the chassis, the suspension system including (i) a front linkage that extends angularly between the chassis and a front portion of the operator platform, and (ii) a back linkage that extends angularly between and interconnects the chassis and a back portion of the operator platform so as to restrict movement of the back portion of the operator platform to movement along a generally vertical travel path.

(Appx46, claim 11 (emphasis added).) The other two asserted claims, claims 14

and 21, also require that the operator platform supports both the seat and "an entire

body of an operator during use of the utility vehicle." (Appx46-47, claims 14 &

21.)

**C. Toro's mowers do not support an entire body of the operator during use of the vehicle because the steering controls are mounted on the chassis, not the suspended operator platform.**

In July 2015, The Toro Company and Exmark Manufacturing, Inc. ("Toro")

began selling mowers with a suspended operator platform. (Appx490; Appx492.)

There is no dispute that the steering controls in Toro's accused mowers are

mounted directly to the chassis, as in the prior art, not the platform. (Appx10;

Appx432; Appx435.) Unlike the claimed invention and like the prior art, it is

undisputed that Toro's accused mower platform does not support the operator's

hands and arms. (Appx10; Appx432; Appx435.)

24

**D. The district court erroneously construed "an entire body of an operator" to exclude the operator's hands and arms, rejected Toro's invalidity arguments in one sentence each, and granted an overbroad preliminary injunction.**

On May 5, 2016, after unsuccessfully competing against Toro for almost one year, Scag sought a preliminary injunction on claims 11, 14, and 21 of the '475 patent. (Appx48-52; Appx53.) Toro requested discovery, but the district court denied that request. (Appx275-276; Appx305.) In its opposition to the preliminary injunction motion, Toro pointed out that the claim limitation "an operator platform that supports a seat and an entire body of an operator during use of the utility vehicle" must be construed to include a platform that supports the entire body of the operator, including the hands and arms, which are in contact with the steering controls during use of the vehicle. (Appx368-377.) Toro demonstrated that because Toro's steering controls are mounted to the chassis, not the platform, the operator's hands and arms are not supported by the platform. (Appx376-377.) Thus, Toro's accused mowers do not infringe. (Appx377.)

Toro also proved that under either construction, Scag's asserted claims would be invalid in view of prior art not before the PTO. (Appx377-380.) Specifically, Toro demonstrated that all of the elements of claims 11 and 14 were found in Henriksson, which disclosed a vehicle with a suspended operator platform and steering controls mounted to the platform. (Appx377-379; Appx410-411.) Toro also showed that all elements of claim 21 were found in Henriksson in view

of Sasaki, which disclosed the specific suspension system claimed in claim 21. (Appx379-380; Appx430.) Finally, Toro explained that Scag's alleged irreparable harm did not justify removing Toro's mowers from the marketplace after more than one year of sales and that it would be Toro and the public that would be irreparably harmed. (Appx380-390.)

On August 1, 2016, the district court granted Scag's motion for preliminary injunction on the condition that Scag post adequate security. (Appx17.) The court agreed the operator platform on Toro's accused mowers does not support an operator's hands and arms: "All of the accused mowers have steering controls connected to the chassis, not the suspended operator platform, which means that the platform does not support the rider's arms and hands." (Appx10.) But the court rejected Toro's noninfringement defense after adopting Scag's proposed construction based on a "conventional chair": "[a] person having ordinary skill in the art would understand the 'entire body' limitation in reference to how a person sits in an ordinary chair." (Appx12.) Without explanation, the court concluded that this construction excludes the operator's hands and arms from "an entire body of an operator." (Appx12-13.)

Similarly without claim construction or findings of fact, the district court dismissed Toro's substantial question of validity in two short paragraphs. (Appx13-14.) The entirety of the court's analysis of Toro's anticipation defense for

claims 11 and 14 was: "Henriksson, however, discloses a heavy-duty truck with a driver's compartment, not an operator platform as described by claims 11 and 14." (Appx13.) As to Toro's obviousness defense for claim 21, the entirety of the court's analysis was: "Defendants offer no reason, and the Court cannot imagine one, that a person of ordinary skill in this field would combine a motorcycle shock with a suspended truck cab and come up with a suspended operator platform." (Appx13.)

At Scag's urging, the district court adopted an overly broad and indefinite injunction that would enjoin Toro from "making, using, selling, and offering to sell lawnmowers equipped with platform suspension systems that infringe Scag's patent, U.S. Patent No. 8,186,475."[3] (Appx6; Appx12.)

On August 4, 2016, Toro filed its notice of appeal. (Appx470.) Toro filed an expedited motion to stay entry of the preliminary injunction. (Appx472-476.) Scag filed an expedited motion to set bond and enter an injunction order. (Appx477-478.)

---

[3] Judge Pepper entered the order for Judge Randa, and two days later the case was reassigned to Magistrate Judge Duffin. (Appx19.) The case was then reassigned to Judge Adelman. (Appx19.) In July and August Judge Randa, who signed the decision granting the preliminary injunction, appears to have transferred all of his cases to other judges. (*See* DI 27 at 10.) Judge Randa passed away on September 5, 2016. *See* http://www.jsonline.com/story/news/local/2016/09/05/longtime-milwaukee-federal-judge-randa-dies/89435354/.

In an August 18, 2016 decision, the district court denied Toro's motion to stay entry of the preliminary injunction. (Appx26.) The district court granted Scag's motion to set bond, which it set at $1,000,000, and preliminarily enjoined Toro "from making, using, selling, and offering to sell lawnmowers equipped with the infringing platform suspension system in accordance with Judge Randa's August 1, 2016 Decision and Order, ECF No. 30." (*Id.*) On August 19, 2016, Toro filed its notice of appeal of the August 18, 2016 decision. (Appx535.) On August 23, 2016, Scag posted bond of $1,000,000. (Appx537-539.)

## SUMMARY OF THE ARGUMENT

A preliminary injunction is a drastic and extraordinary remedy that is not and should not be routinely granted—especially when it takes a product off the market. This case warrants neither a drastic nor extraordinary remedy. It is a garden variety patent dispute between two large manufacturers of lawn mowers and turf vehicles. More than a year ago, Toro began selling a line of mowers with a suspended operator platform. After competing unsuccessfully against Toro's mowers for almost a year, Scag sought a preliminary injunction, claiming it should not have to compete against its "own invention." That argument could be made by all practicing patentees, however, and does not justify a preliminary injunction— especially here where Toro demonstrated that Toro's mowers include the prior art

28

feature criticized in the patent. Like the prior art, in Toro's accused mowers the operator's hands and arms are not supported by the platform.

The district court rejected Toro's noninfringement defenses, however, by erroneously construing "an entire body of an operator" during use of the utility vehicle to exclude the operator's hands and arms. The plain and ordinary meaning of "an entire body of an operator" includes the operator's hands and arms. This is particularly true here because the vehicle is operated by operator's hands and arms and the claim phrase specifically includes the temporal language "during use of the utility vehicle." The specification further supports the plain and ordinary meaning to include the operator's hands and arms, as Scag distinguished prior art that did not support the operator's hands and arms because the steering controls were mounted to the chassis, disclosed only a single embodiment that had steering controls mounted to the platform, and described this single embodiment as "the present invention." It is undisputed that Toro's operator platform does not support the operator's hands and arms because the steering controls are mounted on the chassis, not the platform. Under a proper construction, there is no infringement and the preliminary injunction should be reversed.

Toro also provided invalidating prior art the PTO had not seen that would invalidate the claims under either proposed construction, but the district court summarily dismissed it in two short paragraphs. The court did not construe the

term "operator platform" before concluding that the prior art lacked one. Similarly, the court held no hearing and made no findings of fact before concluding that one of skill in the art would not combine Toro's obviousness references for reasons inconsistent with the Supreme Court's guidance in *KSR*. The criticism of the evidence was particularly egregious because the district court refused Toro's request for limited discovery.

Toro raised substantial questions of infringement and validity—more than adequate to deny a preliminary injunction. Toro also explained why money damages were adequate in this ordinary patent suit where Scag waited almost a year to pursue a preliminary injunction and how the public and Toro are harmed by disrupting the status quo and removing product choice during suit. The preliminary injunction should, as a matter of law, be reversed. At a minimum, the preliminary injunction should be vacated and remanded, as it is vague and overbroad because it fails to comply with the specificity requirements set forth in Rule 65 and this Court's prohibition against injunctions that simply prohibit future infringement of a patent.

**ARGUMENT**

A preliminary injunction is a "'drastic and extraordinary remedy that is not to be routinely granted.'" *Nat'l Steel v. Can. Pac.*, 357 F.3d 1319, 1324 (Fed. Cir. 2004) (citation omitted). "To obtain a preliminary injunction, a party must show

'that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest.'" *Luminara Worldwide v. Liown Elecs.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016) (quoting *Winter v. NRDC*, 555 U.S. 7, 20 (2008)).

The patentee must not only show that it will "likely prove that the accused infringer infringes the asserted patent" but also that the patent will "likely withstand the accused infringer's challenges to the validity and enforceability of the patent." *Sciele Pharma v. Lupin*, 684 F.3d 1253, 1259 (Fed. Cir. 2012). A defendant's burden with respect to invalidity at this stage "'requires less proof than the clear and convincing showing necessary to establish invalidity itself at trial.'" *Entegris v. Pall*, 490 F.3d 1340, 1351 (Fed. Cir. 2007) (quotation omitted). A patentee also "cannot be granted a preliminary injunction unless it establishes both . . . likelihood of success on the merits and irreparable harm." *PGH v. St. John*, 469 F.3d 1361, 1365 (Fed. Cir. 2006).

Preliminary injunctions are reviewed for abuse of discretion. *Novo Nordisk v. Genentech*, 77 F.3d 1364, 1367 (Fed. Cir. 1996). In determining whether a district court's decision to grant a preliminary injunction was an abuse of discretion, "factual findings [are reviewed] for clear error, conclusions of law de novo, and the exercise of a district court's discretion for a clear error of judgment

in weighing relevant factors." *Nat'l Steel*, 357 F.3d at 1325. A district court abuses its discretion when it bases a preliminary injunction on an incorrect claim construction, which is reviewed de novo. *Luminara* 814 F.3d at 1352-54. It is further an abuse of discretion when a district court's finding that the movant failed to raise a substantial question of validity is clearly erroneous. *PGH*, 469 F.3d at 1369. It is also an abuse of discretion to grant a preliminary injunction when the equitable factors weigh in the defendant's favor. *High Tech Medical v. New Image*, 49 F.3d 1551, 1558 (Fed. Cir. 1995) (reversing preliminary injunction because it "cannot stand in the absence of findings favorable to [movant] on those issues" of irreparable harm and likelihood of success); *see also Celgard v. LG Chem.*, 624 Fed. Appx. 748, 755 (Fed. Cir. 2015) (reversing the preliminary injunction and finding "[n]o matter how the district court was to resolve the likelihood of success prong, our determinations on the other three factors precludes entry of a preliminary injunction."). Preliminary injunctions that are premised on an incomplete record with respect to claim construction, infringement, or validity, or in which the district court has failed to make sufficient findings to permit a meaningful review must also be vacated. *Nutrition 21 v. United States*, 930 F.2d 867, 869 (Fed. Cir. 1991); *Oakley v. Int'l Tropic-Cal*, 923 F.2d 167, 170 (Fed. Cir. 1991); *see also Vascular Sol'ns v. Boston Sci.*, 562 Fed. Appx. 967, 967 (Fed. Cir. 2014).

The district court abused its discretion in granting Scag's motion for preliminary injunction because, as a matter of law, the court incorrectly construed "an entire body of an operator" during use of the utility vehicle to exclude the operator's hands and arms. The district court also clearly erred in its findings on the prior art and misapplied binding obviousness law in rejecting Toro's invalidity arguments. Toro demonstrated that Scag was not likely to succeed on the merits of its infringement claim, that a substantial question of validity existed, and that the harm factors were in Toro's and the public's favor, as explained in detail below, and the vague and overbroad preliminary injunction should be reversed.

I.     **The preliminary injunction should be reversed because the claims mean what they say: "an entire body." Not a portion. Not just the torso and feet. Scag chose this limitation and must live with it.**

A.     **The court's construction "in reference to how one sits in an ordinary chair" is contrary to the plain meaning and at odds with the specification.**

Claim construction is "an issue of law [which is reviewed] without deference." *Chamberlain v. Lear*, 516 F.3d 1331, 1335 (Fed. Cir. 2008). Due to the relationship between the claim meaning and the infringement analysis, "[a] correct claim construction is almost always a prerequisite for imposition of a preliminary injunction." *Id.* at 1339-40. If an injunction cannot be supported under the proper construction, it should be reversed. *Id.* at 1340.

The district court's claim construction is wrong. This Court should reverse the preliminary injunction order. Proper construction of "an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle" literally requires that the operator platform support the entire body of the operator—including feet/legs and hands and arms—not only a portion. Scag concedes that an "'entire body' of the operator" includes the operator's feet (DI 21 at 7), and cannot justify the court's construction excluding the operator's hands and arms. Under a proper construction, Toro does not infringe.

> 1.    The plain meaning requires that the operator platform support the operator's hands and arms during use of the vehicle.

Patent claims are to be interpreted according to their plain and ordinary meaning, and "a party wishing to alter the meaning of a clear claim term must . . . demonstrat[e] why such an alteration is required." *K-2 v. Salomon*, 191 F.3d 1356, 1362-64 (Fed. Cir. 1999). The claim limitation "an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle" literally requires that the operator platform support the operator's "entire body" during use of the vehicle. (Appx46, 12:1-14, 23-40; Appx47, 13:7-20.) The plain and ordinary meaning of "an entire body of an operator" during use of the utility vehicle must include the operator's hands and arms. (Appx28, Abst.; Appx42, 4:40-41; Appx43, 5:33-43, 6:7-23.) This is especially true here because the claim phrase further includes "during use of the utility vehicle." (Appx43, 5:1-32.) During use of the

34

utility vehicle, it is driven by the operator's hands and arms via steering controls. (Appx42, 4:38-41; Appx43, 5:1-5.) Thus, the operator platform must support the operator's hands and arms.

Scag admits "'entire body' of the operator" includes more than an operator's torso—it also includes an operator's feet. (DI 21 at 7.) Scag's argument that an operator's hands and arms are not part of an operator's entire body, however, does not follow. If the plain meaning of "an entire body of an operator" includes the operator's feet, there is no reason it would not also include the operator's hands and arms.

While Scag acknowledges that the plain and ordinary meaning controls, Scag convinced the district court to adopt a meaning that was far from plain and ordinary: "[a] person having ordinary skill in the art would understand the 'entire body' limitation in reference to how a person sits in an ordinary chair." (Appx12.) The plain and ordinary meaning of "an entire body of an operator" has nothing to do with how a person sits in an ordinary chair. This is not the plain and ordinary meaning.

The district court's determination that this construction includes the operator's feet and legs but excludes the operator's hands and arms likewise is without support. Scag justifies excluding the operator's hands and arms by analogizing a "conventional chair." (DI 21 at 7.) But a "conventional chair" has

nothing to do with the ordinary meaning of "an entire body of an operator," and

again there is no reason that an "ordinary chair" would mean an "entire body"

includes the feet/legs but excludes the hands and arms. This is particularly true

here where an operator is not just sitting in a chair or even the claimed seat; the

operator is controlling the vehicle via steering controls with its hands and arms

during use of the vehicle. (*See* Appx46-47, claims 11, 14, and 21.) And Scag

admits its "conventional chair" does not support the feet—the *floor* does. (DI 21 at

7.) Scag's analogy, adopted by the district court, is at odds with the plain meaning

of "entire body," which cannot mean only portions of the operator's entire body.

The district court's construction also improperly conflates the "entire body

of an operator" during use of the utility vehicle limitation and the separate "seat"

limitation because the platform already supports a portion of the operator through

the seat element. (Appx46, 12:1-14, 23-40; Appx47, 13:7-20.) Supporting "an

entire body of an operator" during use of the utility vehicle must include

supporting the *rest* of the operator through suspended non-seat components such as

footrests and controls that are in contact with the operator during use of the

vehicle.

The effect of the district court's construction was to read "an entire body of

an operator" out of the claim because the court's construction merely requires

support of that portion of an operator that the seat and footrest already

36

accomplishes. A construction that renders the phrase being construed superfluous must be rejected. *Bicon v. Straumann*, 441 F.3d 945, 950 (Fed. Cir. 2006). The proper interpretation of "an entire body of an operator" is the torso, feet and legs, *and* hands and arms, which means the platform must also include the "controls, or components other than the seat that are in contact with the operator." (*See* Appx41, 1:30-33.)

> 2. Scag distinguished prior art that transmitted shock loads to the operator through non-suspended components and explained that its claimed platform supports "an entire body of the operator."

While patent claims are to be given their plain and ordinary meaning, this is done in light of the specification. *Phillips v. AWH*, 415 F.3d 1303, 1312-16 (Fed. Cir. 2005). Here, the specification is consistent with the plain language of the claims. Every single time the specification uses the phrase "an entire body of the operator" it recites having the steering controls connected to the operator platform. (Appx28, Abst. ("The operator platform supports an entire body of the operator and isolation mounts connect a seat assembly to the operator platform. Steering controls of the ride-on lawnmower are connected to the operator platform so that the steering controls move with the operator platform and are suspended and/or isolated from the chassis."); Appx41, 2:51-54 ("The operator platform supports an entire body of the operator. Steering controls of the vehicle are connected to the operator platform so as to move with the remainder of the platform."); Appx43,

37

6:7-22 ("Referring again to FIGS. 1 and 2, suspension system 100 is configured to support an entire body of the operator, the operator platform 70, and the components attached to the operator platform 70 such as steering controls 55…. This configuration of suspension system 100 enhances operator comfort by isolating the entire operator, including the operator's hands and feet, from shock loads.").)

All of the drawings that show the steering controls show them mounted on the platform, not the chassis. (Appx30-36.) Scag described this configuration, the only one shown, as "the present invention." (Appx42, 3:25-27 (all 11 figures are different views of Fig. 1, which is described as "the present invention").) The "present invention" is just that—the invention claimed. *See Masimo v. Mallinckrodt*, 18 Fed. Appx. 852, 855 (Fed. Cir. 2001) (use of "*present invention*" shows embodiment is the invention (emphasis in original)); *see also Secure Web v. Microsoft*, 640 Fed. Appx. 910, 914-15 (Fed. Cir. 2016) (use of "according to the present invention" and "according to the instant invention" demonstrated figures depicted the claimed invention rather than merely a preferred embodiment). Scag's choice to refer to the sole embodiment as "the present invention" demonstrates that it is the claimed invention.

In addition, Scag specifically explained that the prior art was inferior for failing to support the entire body of the operator, as the operator could still receive

shock loads during use through the non-suspended components in contact with the operator. (Appx41, 1:18-24, 1:50-60.) As Scag recognized, the suspended seat prior art did not support the entire body of the operator; instead the operator's feet and hands were supported by the chassis through footrests and controls connected to the chassis. (Appx41, 1:18-24.) As Scag further recognized, Scheele's suspended operator platform did not support the entire body of the operator because the operator's hands and arms were supported by the chassis through steering controls mounted to it. (Appx41, 1:50-60.) The prior art did not isolate the entire body of the operator from shock loads because not all of the components in contact with the operator were suspended from the rigid chassis to prevent shock loads from being transmitted to the operator. (Appx41, 1:56-60.) The patent repeatedly describes reducing shock loads to the operator by suspending from the rigid chassis everything that contacts the operator, not just the seat. (Appx41, 1:18-21, 30-33, 56-60, 2:51-54; Appx42, 4:1-7, 38-41; Appx43, 5:36-39, 6:19-22.)

The "operator platform that supports . . . . an entire body of an operator during use of the utility vehicle" element distinguished the prior art that did not support the entire body of the operator. To find "an operator platform that supports . . . an entire body of an operator during use of the utility vehicle" requires the platform to support only the torso and feet would run afoul of how Scag distinguished the prior art including Scheele. *See O.I. Corp. v. Tekmar Co.*, 115

39

F.3d 1576, 1581-82 (Fed. Cir. 1997) (since "the description expressly distinguishe[d] over prior art" based on certain features of the prior art, the asserted claim therefore "does not encompass [those features]").

Contrary to Scag's suggestion, Toro's construction does not import a limitation from the patent—it construes the claims as written, not as Scag wishes it had written them. *See Chef Am. v. Lamb-Weston*, 358 F.3d 1371, 1374 (Fed. Cir. 2004) (construing the "claim as written, not as the patentees wish they had written it"). This is not a case where there is a preferred embodiment but the claims are broad enough to cover more. Here, only one embodiment is disclosed and the claims cover just that embodiment. *Toro v. White*, 199 F.3d 1295, 1301 (Fed. Cir. 1999) ("This is not simply the preferred embodiment; it is the only embodiment."). The claims mean what they say: "an entire body." Not a portion. Not just the torso and feet. Scag chose this limitation and must live with it.

Scag does not dispute that the patent discloses only a single embodiment where the controls are connected to the platform. (*See* DI 21 at 9.) Scag argues, however, that mounting the steering controls to the platform "is something that 'may' be done, not something that *must* be done." (*Id.* at 14 (emphasis in original).) Scag relies on the following passage from the Summary of the Invention to support its argument:

> It is also desired to provide a suspended operator platform that suspends or isolates at least some controls from the rigid chassis of the ride-on mower.

> For instance, steering controls may be mounted on the suspended platform so as to move in unison with the suspended operator platform.

(Appx41, 2:36-41.)

That passage—merely a statement of "desire" instead of a statement of what the invention is—does not describe mounting the steering controls anywhere other than the platform, which is the only location taught. The passage is not used in describing how "an entire body of an operator" is supported, the relevant limitation here. Indeed, later in that same section, when describing "an aspect of the invention," Scag specifically explains how it actually accomplishes those desires/goals: "The operator platform *supports an entire body of the operator*. Steering controls of the vehicle *are connected* to the operator platform so as to move with the remainder of the platform." (Appx41, 2:51-54 (emphasis added).) Unlike Scag's desires, the actual description of the invention is not at all optional—the controls are mounted to the platform in order to isolate the entire body of the operator from shock loads.

Further, an isolated statement in the Summary of the Invention that "steering controls *may* be mounted on the suspended platform" does not override the teachings of the specification as a whole. As this Court has recognized, "[o]ne isolated statement in the Summary of the Invention to the effect that the limitation at issue 'may' be an adaptive noise canceler does not override the teachings of the specification as a whole…." *Masimo*, 18 Fed. Appx. at 855. Likewise, reliance on

41

boilerplate phrases that appear in nearly all patents cannot obviate the plain meaning of the claim terms. *See IP v. eCollege.com*, 156 Fed. Appx. 317, 321-22 (Fed. Cir. 2005) (rejecting "common boilerplate language").

The specification does not support the district court's construction of "how a person sits in an ordinary chair." An ordinary chair has nothing to do with isolating the entire body of the operator from shock loads transmitted through non-suspended components in contact with the operator. Especially because here an operator is not just sitting in a chair or even the claimed seat—the operator is controlling the vehicle via steering controls with its hands and arms. (Appx41, 1:56-60; Appx42, 4:38-41; Appx43, 5:1-5.) The specification does not use the word "chair." Indeed, as discussed above, the district court's construction improperly conflates the "entire body of an operator" during use of the utility vehicle limitation and the separate "seat" limitation because the platform *already* supports a portion of the operator through the seat element. That was Scag's criticism of the suspended seat prior art: it did not also support those portions of the operator in contact with non-seat components through which shock loads were still transmitted from the rigid chassis to the operator. (Appx41, 1:28-33.)

Under the district court's incorrect construction, the operator is subjected to shock loads into its hands and arms through the steering controls mounted on the chassis. But that was Scag's criticism of Scheele: while its suspended operator

platform supported the operator's torso and feet, it did not support the entire body of the operator because the operator's arms were subjected to shock loads from the steering controls mounted on the chassis. Thus, supporting the "entire body of an operator during use of the utility vehicle" must include supporting the *rest* of the operator through non-seat components such as footrests and controls. (Appx41, 1:28-33.) That is consistent with Scag's argument that the claimed platform supports the operator's feet through a footrest connected to the suspended platform. So too must the operator's hands and arms be supported by the suspended operator platform through steering controls connected to it, so that the entire body of the operator is isolated from shock loads transmitted through the rigid chassis.

The district court's claim construction methodology was in error. It adopted a "plain and ordinary meaning" that was far from plain and ordinary, and has no support either in the claim language or the specification. The court's construction is divorced from the phrase it was actually construing, "an entire body of an operator," and does not consider the context of that phrase, "during use of the utility vehicle." It did not take into account the way the phrase was used in the specification, the fact that specific prior art was distinguished, nor the description of the only disclosed embodiment as "the present invention." These errors led the court to adopt a construction that is in error as a matter of law.

3.    <u>Claim differentiation does not save Scag's claims because the doctrine does not apply here and is easily overcome.</u>

The district court relied on claim differentiation to support its construction. (Appx12.) But claim differentiation does not save Scag from the language it chose. The doctrine of "claim differentiation" does not apply if the "claims are not otherwise identical." *Andersen Corp. v. Fiber Composites, LLC*, 474 F.3d 1361, 1370 (Fed. Cir. 2007). The doctrine merely creates a presumption; it "is not a hard and fast rule" of construction. *Seachange v. C-COR*, 413 F.3d 1361, 1369 (Fed. Cir. 2005). The doctrine "cannot be used to overcome the plain language of the claims themselves," *Mycogen Plant Sci. v. Monsanto*, 243 F.3d 1316, 1329 (Fed. Cir. 2001), and "any presumption created by the doctrine of claim differentiation 'will be overcome by a contrary construction dictated by the written description or prosecution history.'" *Retractable Techs. v. Becton*, 653 F.3d 1296, 1305 (Fed. Cir. 2011) (quoting *Seachange*, 413 F.3d at 1369). As this Court has recognized, "claims that are written in different words may ultimately cover substantially the same subject matter." *Multiform Desiccants v. Medzam*, 133 F.3d 1473, 1480 (Fed. Cir. 1998).

Claim differentiation does not apply here because the claims include additional elements. The other claims include more than just controls mounted on the platform—they *also* "move with" the operator platform, most "in unison." Claim 12, for example, sets forth: "The riding utility vehicle of claim 11, further

44

comprising steering controls for directing movement of the utility vehicle, *the steering controls* being connected to and *moving in unison with the operator platform*." (Appx46 (emphasis added).) This claim, as well as claims 1, 20, and 26, all include limitations beyond the steering controls being connected to the platform. (Appx46-47 (claim 1 ("moving in unison with"), claim 20 (same), claim 26 ("move with")).) Claim differentiation does not apply if the claims include additional limitations, *Andersen*, 474 F.3d at 1370, and thus does not apply here.

Claim differentiation is easily overcome by the plain language or specification. *Mycogen*, 243 F.3d at 1328-29 ("claim differentiation cannot be used to overcome the plain language"); *see also Retractable v. Becton*, 653 F.3d 1296, 1304-05 (Fed. Cir. 2011) (rejecting claim differentiation, finding "body" is "one piece body" because specification distinguished prior art and disclosed only one piece embodiment); *GPNE v. Apple*, 2016 U.S. App. Lexis 13862, at *9-10 (Fed. Cir. Aug. 1, 2016) (explaining claim differentiation "is 'not a hard and fast rule,' but rather a presumption that will be overcome when the specification or prosecution history dictates a contrary construction"; holding because the specification used the term "pager" when referring to the claimed devices, "node" should be construed as "pager," despite claim differentiation (citation omitted)). Any presumption would be overcome here.

45

Scag's inclusion of an operator platform that supports an "entire body of an operator during use" in all asserted claims was not an accident—it chose that phrase, distinguishing the claims from criticized prior art that did not support the entire body of the operator during use. (Appx41, 1:34-60.) As discussed above, the claim language and specification dictate a construction where the suspended operator platform supports the *entire* body of the operator including hands and arms. To the extent that the presumption of claim differentiation applies, which it does not because the claims include other limitations, it would be easily overcome by the claim language and specification.

The district court relied on its erroneous claim construction to conclude that Toro's mowers, which it found do not support the operator's hands and arms during operation because the steering controls are mounted to the chassis, nonetheless meet the limitation of supporting the "entire body of an operator during use of the utility vehicle." (Appx10-13.) This was in error because the entire body of the operator is not isolated from shock loads that can be transmitted from the rigid chassis through the steering controls and into the operator's hands and arms. Toro has demonstrated a strong likelihood of success on the merits. The preliminary injunction should be reversed.

46

**B.    Scag cannot use claim construction to reclaim that which it disclaimed.**

When the specification makes clear, either explicitly or implicitly, that the invention does not include a particular feature, that feature will be deemed disclaimed from the claim scope. *Luminara*, 814 F.3d at 1353. Statements such as "the present invention includes" and "the present invention is" act as a clear and unmistakable disavowal of claim scope by "implicitly alerting the reader that 'this description limits the scope of the invention.'" *Id*. at 1353; *see also Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 (Fed. Cir. 2007) ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention.").

In *Luminara*, this Court vacated a preliminary injunction that was based on an erroneous claim construction. 814 F.3d at 1354. The specification explained that the "present description addresses the above and other problems by providing kinetic flame devices that create lighting effects driven by real but chaotic physical movements." *Id* at 1353. The Court found that "[b]y teaching that the 'present description' solves the problems associated with the prior art candle devices because it is driven by 'real but chaotic movements,' the patentee disclaims devices driven by rhythmic or metronomic patterns." *Id*. at 1354.

Scag disclaimed coverage of vehicles having steering controls mounted on the chassis, like Toro's accused mowers. The specification makes clear both

explicitly and implicitly that Scag's invention did not include steering controls

mounted on the chassis. Scag's only disclosed embodiment had steering controls

mounted on the platform, not the chassis. (Appx30, Fig. 1.) Scag described this

sole embodiment as "the present invention" (Appx42, 3:25-27), demonstrating that

its claimed invention included steering controls mounted on the platform. *See*

*Luminara*, 814 F.3d at 1354.

Scag explicitly criticized Scheele for mounting the steering controls on the

chassis, which caused both a meandering feel and shock loads to the operator's

arms. (Appx41, 1:56-60.) In doing so, Scag disclaimed coverage of ride-on

mowers having steering controls mounted on the chassis, which is exactly the

configuration of Toro's accused mowers. *See Andersen*, 474 F.3d at 1373 ("By

distinguishing [the prior art] in that manner, the applicants clearly disclaimed

structural members made [according to the prior art]."). (Appx10.) Scag cannot use

claim construction to reclaim this disclaimed scope. *See David Netzer Cons'g*

*Eng'r v. Shell Oil*, 824 F.3d 989, 998 (Fed. Cir. 2016) (holding that the patentee

cannot assert infringement of that which was disclaimed); *SciMed Life Sys. v. Adv.*

*Cardiovascular Sys.*, 242 F.3d 1337, 1342-43 (Fed. Cir. 2001) (agreeing that

"claims should not be read so broadly as to encompass the distinguished prior

art.").

In its opposition to Scag's request for a preliminary injunction, Toro explained to the district court that Scag had disclaimed mowers having steering controls connected to the chassis. (Appx374-376.) The district court did not address Toro's disclaimer argument. (Appx11-13.) The district court's construction was legally erroneous and the preliminary injunction should be reversed.

## II.    The preliminary injunction should be reversed because, after denying discovery, the district court rejected anticipation and obviousness defenses in a single sentence each.

A preliminary injunction is not warranted if the accused infringer raises a substantial question concerning validity, which the patentee is unable to prove lacks substantial merit. *Nat'l Steel*, 357 F.3d at 1325. The burden of raising a substantial question of validity is lower than the ultimate burden at trial; "vulnerability is the issue at the preliminary injunction stage, while validity is the issue at trial." *Id*. at 1335. When the district court clearly errs in determining that the defendant failed to raise a substantial question of validity, the preliminary injunction must be vacated as an abuse of discretion. *Sciele*, 684 F.3d at 1263 ("Because the district court incorrectly concluded that Lupin failed to raise a substantial question of validity . . . it abused its discretion by issuing a preliminary injunction."); *see also Nat'l Steel*, 357 F.3d at 1325, 1340 (vacating the preliminary injunction because "the district court erred in its conclusion that NSC demonstrated that CPR's obviousness defense lacked substantial merit.").

49

Toro demonstrated a substantial question of validity with respect to the '475 patent and the court misapplied settled law and clearly erred in granting the preliminary injunction, abusing its discretion. The '475 patent, which covers utility vehicles in addition to ride-on mowers (Appx41, 2:25-36), was not the first to claim a suspended operator platform that supports the entire body of the operator during use of the vehicle. Indeed, a prior art suspension system from a utility vehicle with an operator platform suspended by links and shocks "to cushion the driver against shocks absorbed by the vehicle from earth or road" was patented 40 years before Scag claimed the same thing. (Appx407, 1:17-18.) Toro demonstrated that all of the elements of claims 11 and 14 were found in Henriksson, and Henriksson in view of Sasaki for the limitations of claim 21. (Appx378-380; Appx410-411; Appx430.)

## A.   The district court did not construe "operator platform" before finding that Henriksson does not disclose one as claimed in '475 patent claims 11 and 14.

A prior art suspension system from a utility vehicle with an operator platform suspended by links and shocks "to cushion the driver against shocks absorbed by the vehicle from earth or road" was patented in 1969—40 years before Scag claimed the same thing. U.S. Patent No. 3,420,568 to Henriksson ("Henriksson"), like the '475 patent, is a rigid chassis vehicle for all-terrain use. (Appx407, 1:17-18, 1:24-35.) Henriksson explains that his suspended operator

50

compartment reduces shock loads to the operator. (Appx407, 1:35-37.) Henriksson

also distinguishes suspended seats by criticizing that the non-seat controls are not

supported (Appx407, 1:39-46), the same way Scag did (Appx41, 1:50-60).

Figure 1 of Henriksson is shown below:



Just as in the '475 patent, Henriksson teaches a suspended operator platform (3)

(green) that carries the operator's seat and operator. (Appx403; Appx407, 2:15-63;

Appx410.) The seat is not shown in Figure 1 of Henriksson, but it is implicit based

on the disclosure and was added and colored in pink. (Appx407, 1:39-46.) The

platform (3) is connected to the vehicle chassis (2) (blue) by the angled, pivotal

links (10, 15) (yellow). (Appx407, 2:10-63.) The pivotal links (10, 15) form a

parallelogram linkage with respect to the platform (3) and chassis (2). (Appx407,

2:46-60.) A duplicate set of laterally offset links (20, 21) (not shown in Fig. 1)

additionally connect the platform (3) and chassis (2) together. (Appx407, 2:55-60.)

Together, the two parallelogram linkages formed by the links (10, 15, 20, 21),

along with shocks (24, 25), constrain the platform (3) to primarily vertical motion

with respect to chassis (2). (Appx407.) Henriksson shows that suspended operator

platform vehicle suspension systems for supporting the entire body of an operator

during use of the vehicle were well known before Scag's alleged invention in

2010.

Henriksson discloses all claim elements of Scag's claims 11 and 14:

| Claim 11 | Claim 14 | Henriksson |
|---|---|---|
| A riding utility vehicle, comprising: | A utility vehicle, comprising: | Henriksson is a riding utility vehicle. (Appx407, col. 1.) |
| a chassis that supports a drive train; | a chassis that supports a drive train and that defines a front portion and a rear portion; | Henriksson has a chassis (2) that supports a drive train (1) and defines a front portion and a rear portion. (Appx407, 2:8-18, 46-55.) |
| a seat; | a seat; | Henriksson has a seat (colored pink above) for the operator. (Appx407, 1:40-49.) |
| an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle; | an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle and that defines a front portion and a rear portion; | Henriksson has an operator platform (3) (colored green above) that supports the seat and an entire body of an operator during use of the utility vehicle. (Appx407, 1:24-31, 47-49.) The operator platform has a front portion and a rear portion. (Appx407, 2:46-55.) |
| a suspension system connecting the operator platform to the chassis, the suspension system including (i) a front | and a linkage system connecting the front portion of the operator platform to the front portion of the chassis and connecting the rear | Henriksson has a suspension/linkage system connecting the operator platform to the chassis allowing vertical movement of the operator platform with respect to the chassis. |

| | | |
|---|---|---|
| linkage that extends angularly between the chassis and a front portion of the operator platform, and (ii) a back linkage that extends angularly between and interconnects the chassis and a back portion of the operator platform so as to restrict movement of the back portion of the operator platform to movement along a generally vertical travel path. | portion of the operator platform to the rear portion of the chassis, the linkage system allowing vertical movement of the operator platform with respect to the chassis and substantially preventing (i) transverse swaying of the operator platform with respect to the chassis, (ii) rolling of the operator platform about a longitudinal axis of the platform, and (iii) yawing of the operator platform about an upright axis extending longitudinally through the chassis. | Henriksson has front links (15, 21) and rear links (10, 20) (colored yellow above). (Appx407, 2:55-60.) Henriksson describes "pairs of pivotable links connected to the compartment and to the frame for guiding the compartment in its vertical movement." (Appx407, Abst.) Additionally, Henriksson describes "[t]he two link parallelograms assure that the upward and downward resilient motions relatively to the vehicle motion become a parallel motion." (Appx407, 2:61-63.) |

(Appx46; Appx407.)

The court's sole finding as to claims 11 and 14 was that Henriksson did not include an operator platform. (Appx13.) The court did not construe "operator platform" in finding one was lacking from Henriksson, even though the first step of an invalidity analysis requires claim construction. *Amazon.com v. Barnesandnoble.com*, 239 F.3d 1343, 1351 (Fed. Cir. 2001). The court also erred in dismissing invalidity in conclusory statements. *Nutrition 21*, 930 F.2d at 869 (vacating the preliminary injunction and noting that "[s]ufficient factual findings

on the material issues are necessary to allow this court to have a basis for meaningful review.").

In its opposition to Toro's request for a stay, Scag argued that the district court did not err because Henriksson's driver's compartment includes four vertical walls in addition to a bottom floor. (DI 21 at 15.) But the district court made no such findings. (Appx13.) Regardless, neither the claims nor specification limits "operator platform" to one that excludes additional elements such as walls. In fact, the operator platform of the '475 patent has walls (74) and shelf (78). (Appx43, 6:1-6.) Ride-on mowers often have "cabs" that consist of walls as well. (*See* Appx259.) Indeed, Scag asserted its invention could be applied to all-terrain vehicles, which often have walls around the operator. (Appx41, 2:25-36.)

Further, as a matter of law, the addition of elements in the prior art does not avoid anticipation just as the addition of elements in an accused device does not avoid infringement. *Cias v. Alliance Gaming*, 504 F.3d 1356, 1360 (Fed. Cir. 2007) (infringing devices may contain additional but unclaimed features); *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001) ("That which infringes if later anticipates if earlier." (internal quotations omitted)). In the claims, the operator platform must merely support a seat and an entire body of an operator during use of the utility vehicle (Appx46, claims 11 & 14), which Henriksson's driver's compartment does. (Appx410-411.)

54

Toro demonstrated claims 11 and 14 were anticipated by Henriksson, and the district court clearly erred as a matter of law and fact in rejecting Toro's invalidity defense, and therefore abused its discretion in granting the preliminary injunction. *See Sciele*, 684 F.3d at 1263.

### B. In rejecting a motivation to combine Henriksson and Sasaki for claim 21, the district court ignored that the prior art taught the same problem and suggested the same solution.

While Henriksson alone does not disclose whether his shocks have dual adjusters—for fine and coarse adjustment—as Scag claimed in claim 21, shock absorbers having both coarse and fine adjustment were also well-known long before the '475 patent application was filed. Below is an image from a published 1980 Japanese patent application, Japanese Patent No. JPS5569340(A), to Sasaki ("Sasaki") showing and describing a coil-over shock absorber having both coarse and fine adjustment.[4] (Appx417.) This permits the user to take into account the weight of the rider as well as the usage conditions and adjust the damping effect of the shock absorber accordingly. (Appx419.)

---

[4] Indeed, the shock Scag used in its commercial embodiment looks nearly identical to Sasaki. (Appx400.)



(Appx417; Appx422-424; Appx426; Appx430.) As shown, in Sasaki an adjustment ring (16) (green) has a seat (19) for the lower end of the coil spring (10). When ring (16) is rotated relative to the cam (15) (blue), the fingers (20) on ring (16) cam themselves up or down the contours of the cam face, depending on the direction of rotation of ring (16) to further compress or ease the compression on spring (10). (Appx422-423; Appx426.) This is the fine adjustment. (Appx422-423; Appx426.) The position of cam (15) is also adjustable up and down by selecting which of the axially spaced grooves (13) receives the retaining ring (14). (Appx423-424; Appx426.) This is the coarse adjustment. (Appx424; Appx426.)

Henriksson in view of Sasaki discloses the claim elements of Scag's claim 21:

| Claim 21 | Henriksson in view of Sasaki |
|---|---|
| A riding utility vehicle, comprising: | Henriksson is a riding utility vehicle. (Appx407, col. 1.) |
| a chassis that supports | Henriksson has a chassis (2) that supports a drive |

| | |
|---|---|
| a drive train and a mower deck; | train (1). (Appx407, 2:8-10.) Henriksson states the vehicle "can be of any desired kind." (Appx407, 2:9-13.) It would have been an obvious design choice to have that vehicle comprise a riding mower with a mower deck. |
| a seat; | Henriksson has a seat (colored pink above) for the operator. (Appx407, 1:40-49.) |
| an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle; | Henriksson has an operator platform (3) (colored green above) that supports the seat and an entire body of an operator during use of the utility vehicle. (Appx407, 1:24-31, 47-49.) |
| a suspension system connecting the operator platform to the chassis and including (i) a course-stiffness adjuster that is configured to adjust a suspension stiffness setting within a first range of stiffness settings, and (ii) a fine-stiffness adjuster that, with respect to each of the first range of settings, is configured to adjust the suspension stiffness setting within a second range of stiffness settings. | Henriksson has a suspension/linkage system connecting the operator platform to the chassis. (Appx407, Abst., 2:55-63.) Sasaki discloses a course-stiffness adjuster that is configured to adjust a suspension stiffness setting within a first range of stiffness settings, and a fine-stiffness adjuster that, with respect to each of the first range of settings, is configured to adjust the suspension stiffness setting within a second range of stiffness settings. (Appx417; Appx422-423; Appx424; Appx426.)

The yellow front links (15, 21) and rear links (10, 20) of Henriksson with the coil-over shocks (4, 7) of Henriksson replaced with Sasaki's adjustable shocks as would have been obvious under 35 U.S.C. § 103 to let the driver adjust the ride stiffness. When so modified, the coarse adjuster is the yellow repositionable retaining ring (14) of Sasaki and the fine adjuster is the green adjustment ring (16) engaging the blue cam (15) of Sasaki. |

(Appx47; Appx407; Appx417-428.)

The district court misapplied well settled law and thus abused its discretion by rejecting Toro's obviousness argument as to claim 21. The court did not find that Henriksson and Sasaki failed to disclose any of the elements of claim 21, only

that there was no motivation to combine because Sasaki was a motorcycle shock. (Appx13 ("Defendants offer no reason, and the Court cannot imagine one, that a person of ordinary skill in this field would combine a motorcycle shock with a suspended truck cab and come up with a suspended operator platform.").) That analysis is inconsistent with *KSR v. Teleflex*, 550 U.S. 398, 420-21 (2007). As the Supreme Court counseled there, "The idea that a designer hoping to make an adjustable electronic pedal would ignore Asano because Asano was designed to solve the constant ratio problem makes little sense. A person of ordinary skill is also a person of ordinary creativity, not an automaton." *Id.*

Henriksson sought to solve the same problems as Scag and criticized similar prior art that did not suspend the operator controls. (Appx407, 1:15-18, 1:43-44.) Specifically, Henriksson recognized the desirability of reducing shocks to the operator. (Appx407, 1:36-46.) Henriksson further recognized that the size and power of the springs should be selected such that a suitable amount of resistance is provided. (Appx407, 2:28-35.) Conventional shock absorbers as well as telescope-type mounted within helical springs were both specified as potential methods of reducing shocks to the operator. (Appx407, 2:36-39.) It would have been obvious to a person of skill in the art to combine Henriksson and Sasaki. This was enough to raise a substantial question of validity. *See Apple v. Samsung*, 816 F.3d 788, 802 (Fed. Cir. 2016) (a reference is analogous art if it is "reasonably pertinent to the

particular problem with which the inventor is involved"). As a result of this clear

error, the district court abused its discretion in granting the preliminary injunction.

The injunction should therefore be vacated.

## III.    The district court disrupted the status quo by elevating competition over Toro's and the public's harms.

It is an abuse of discretion to grant a preliminary injunction when the

equitable factors weigh in the defendant's favor. *High Tech Med.*, 49 F.3d at 1558;

*see also Celgard*, 624 Fed. Appx. at 755. A patentee is not entitled to a preliminary

injunction unless it establishes *both* irreparable harm and likelihood of success on

the merits. *Amazon.com*, 239 F.3d at 1350; *see also Automated Merch. v. Crane*,

357 Fed. Appx. 297, 300 (Fed. Cir. 2009).

Toro has demonstrated it is likely to succeed on the merits. That alone is

enough to reverse the injunction. Further, Scag did not establish the balance of

harms or public interest weigh in its favor, and the district court clearly erred in

finding otherwise.

## A.    Toro will be severely harmed if the injunction is not reversed and Scag's harm is compensable.

A party seeking a preliminary injunction must "demonstrate that irreparable

injury is *likely* in the absence of an injunction"—not merely a possibility. *Winter*,

555 U.S. at 22 (emphasis in original). Lost sales alone are not sufficient to support

a finding of irreparable harm, as that "would require a finding of irreparable harm

to every manufacturer/patentee, regardless of circumstances." *Abbott Labs. v. Andrx Pharms., Inc.*, 452 F.3d 1331, 1348 (Fed. Cir. 2006) (quotation omitted); *see also Automated Merch.*, 357 Fed. Appx. at 301 ("Lost sales (without more) are presumed to be compensable through damages."). Further, "neither the difficulty of calculating losses in market share, nor speculation that such losses might occur, amount to proof of special circumstances justifying the extraordinary relief of an injunction prior to trial." *Nutrition 21*, 930 F.2d at 871. If it were, it "would apply in every patent case where the patentee practices the invention." *Id*.

The district court accepted that, if enjoined, Toro would suffer "significant loss of sales and expected revenue, potential harm caused by failure to fulfill outstanding orders and/or costs associated with storage and transportation of enjoined products, and other unspecified harms, including reputational damages." (Appx16.)

The court abused its discretion in finding that Scag's harm, "compet[ing] against its own patented invention," something all patentees claim against alleged infringers and something it chose to do for almost a year, outweighed Toro's harm. (Appx16-17.) The court improperly relied on *Robert Bosch v. Pylon*, 659 F.3d 1142, 1156 (Fed. Cir. 2011), a *permanent* injunction decision following a finding of infringement at trial, not a preliminary injunction. (Appx16-17.) The difference is controlling. All patent owners that compete can allege they are competing

against their own invention, but that is only true after a determination of infringement. Further, in *Bosch*, the court's decision was not based solely on the fact that Bosch was "compet[ing] against its own patented invention." The court's quote further notes the permanent injunction is appropriate because of "the resultant harms described above" including the fact that the adjudicated infringer was likely unable to pay the very large damages award. *Id.* at 1156. The current situation does not support a preliminary injunction.

The court also erred by ignoring Toro's evidence of other mowers in the market. (Appx489-490; Appx491-493; Appx15.) Despite Toro's request, the district court did not permit limited expedited discovery and therefore Toro was unable to fully investigate other products that may be competing with Scag's mower. (Appx304-305.) Nevertheless, Toro submitted evidence of at least twelve companies that each sell mowers designed to dampen vibration, increase operator comfort, and lessen operator fatigue, including Husqvarna, the owner of the Scheele prior art with the suspended operator platform. (Appx432; Appx345.) Even Scag admitted that there were others on the market. (Appx102.) The district court failed to consider this evidence when reaching its determination that Scag "owned about 100% of the market share for lawnmowers with suspended operator platforms" prior to Toro's entry. (Appx15). The district court's failure to consider

this relevant evidence, especially in light of its denial of Toro's request for discovery, is clear error that warrants reversal of the preliminary injunction.

Scag acknowledged that loss of sales was compensable and would not support a preliminary injunction. (Appx74.) Toro demonstrated that Scag was not even losing sales to Toro, as its customers purchase its products for reasons other than the alleged invention. (Appx383-384.) Indeed, Toro demonstrated that Scag had been on the market for several years and did not lose sales to Toro. (Appx383.) The district court erred in accepting Scag's argument that brand loyalty resulted in the loss of "a potentially lifelong customer." (Appx15.) There are no facts to support this finding. There was nothing suggesting these customers were buying the machines for the first time or that Scag lost even a single customer to Toro, let alone a "lifelong customer."

### B.    Toro's legitimate design-around efforts favor reversal.

There is a "policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation." *Tivo v. Echostar*, 646 F.3d 869, 883 (Fed. Cir. 2011). There is also a public interest in "permitting full and free competition in the use of ideas which are in reality a part of the public domain." *Lear v. Adkins*, 395 U.S. 653, 670 (1969). Injunctions are meant to preserve, not disrupt, the status quo. *Smith v. Hughes*, 718 F.2d 1573, 1578 (Fed. Cir. 1983).

The injunction in this case is against the public interest because it penalizes Toro's use of a criticized prior art feature. Toro, in good faith, mounted its steering controls to the chassis, not the platform, as did the criticized Scheele design in the prior art. (Appx345.) Toro's legitimate design-around efforts should be encouraged, not enjoined.

Moreover, the injunction disrupts the status quo—removing from the public mowers that have been available for over a year. Preliminary injunctions are typically reserved for cases in which a competitor is about to *enter* a market, such as a generic drug manufacturer. In those cases, courts may be willing to preserve the status quo to prevent the lower cost generic drug from potentially damaging the branded manufacturer's goodwill and pricing. *See, e.g.*, *AstraZeneca v. Apotex*, 633 F.3d 1042, 1062-63 (Fed. Cir. 2010). That is not the case here. Toro and Scag are both large turf-equipment manufacturers that sell vehicles at comparable prices, and Toro was already in the market with these mowers for over a year. Both the public and Toro will be harmed unless this Court reverses the injunction and returns the parties—and the marketplace—to the status quo.

### C.     Scag's delay of almost one year in seeking a preliminary injunction should not disrupt the status quo.

A patentee's delay in seeking a preliminary injunction for alleged patent infringement cuts against a finding of irreparable harm because it "suggests that the status quo does not irreparably damage [the patentee]." *Nutrition 21*, 930 F.2d

at 872; *see also T.J. Smith & Nephew v. Consol. Med. Equip.*, 812 F.2d 646, 648 (Fed. Cir. 1987) ("delay in seeking an injunction" is "incompatible with the emphasis on the right to exclude.").

The court abused its discretion by finding that Scag's 10-month delay in seeking a preliminary injunction does not undercut its claim of irreparable harm. Scag does not dispute it was aware of Toro's mowers shortly after their launch in July 2015, but Scag delayed seeking a preliminary injunction for 10 months. (Appx16.) Scag argues that it did not "see" the accused mowers until October 2015 and needed six months to do its pre-suit investigation. (Appx450.) Given the claims and technology, a 10-month delay is unreasonable and strongly undercuts Scag's claim of irreparable harm. *See Nutrition 21*, 930 F.2d at 868, 872 (delay of seven months undercuts irreparable harm claim); *Nutrition 21 v. United States*, 930 F.2d 862, 863 (Fed. Cir. 1991) (suit filed in January 1990, showing seven month delay).

## IV.    At a minimum, the preliminary injunction should be vacated and remanded because it is vague and overbroad.

Rule 65(d) states that every order granting an injunction must state its terms specifically and describe in reasonable detail the act or acts sought to be restrained. Fed. R. Civ. P. 65(d). This Court rejects injunctions that "simply prohibit[] future infringement of a patent." *Int'l Rectifier v. IXYS*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) (rejecting injunction that barred "infringement by 'any device covered by

one or more of Claims 1 through 5' of the '481 patent"). "[W]hether the terms of an injunction fulfill the mandates of Rule 65(d) is a question of law that [is] review[ed] without deference." *Id*. at 1315.

This Court should vacate the preliminary injunction because it is overly broad and does not comply with Rule 65(d). The order enjoins Toro from "making, using, selling, and offering to sell lawnmowers equipped with platform suspension systems that infringe Scag's patent, U.S. Patent No. 8,186,457." (Appx6; Appx26.) Neither order lists the claims infringed, which products Toro is enjoined from making, using, or selling, nor the configuration that is the basis of the decision. Such an injunction is not sufficient under Rule 65(d) and must be vacated. *See Int'l Rectifier*, 383 F.3d at 1316-17.

## CONCLUSION

The court's claim construction of "entire body" should not have excluded the operator's hands and arms. It is undisputed that Toro's mowers do not have a platform that supports the operator's hands and arms because the steering controls are mounted on the chassis. Under a proper claim construction those mowers do not infringe. Even under the court's incorrect claim construction, Scag's claims are invalid, which the district court failed to properly analyze. Moreover, Toro demonstrated a substantial case and harm factors in its favor. The availability of money damages and Scag's own delay in seeking a preliminary injunction severely

undercut its claim of irreparable harm. In contrast, Toro showed that it and the

public would suffer much greater harms than Scag if enjoined. This injunction

takes the remarkable step of entirely removing a product from the market. That is

not the status quo, not consistent with the law, and should be rejected by this Court

otherwise the record here would turn every garden variety patent dispute into a

case for a preliminary injunction.

September 14, 2016                              Respectfully Submitted,

                                        By: s/Rachel C. Hughey
                                            Anthony R. Zeuli
                                            Rachel C. Hughey
                                            MERCHANT & GOULD PC
                                            3200 IDS Center
                                            80 South Eighth Street
                                            Minneapolis, MN 55402
                                            (612) 332-5300

                                            *Attorneys for Defendants-Appellants*
                                            *The Toro Company and Exmark*
                                            *Manufacturing Co., Inc.*

**ADDENDUM**

| Description | Addendum Page Nos. |
|---|---|
| Decision and order dated August 1, 2016 (DI 30) | Appx6-18 |
| Decision and order dated August 18, 2016 (DI 47) | Appx19-27 |

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

**METALCRAFT OF MAYVILLE, Inc.,**
**d/b/a SCAG POWER EQUIPMENT,**

        Plaintiff,

        -vs-                          **Case No. 16-C-544**

**THE TORO COMPANY and**
**EXMARK MANUFACTURING, Inc.,**

        Defendants.

---

### DECISION AND ORDER

---

Metalcraft of Mayville, Inc., d/b/a Scag Power Equipment, moves for a preliminary injunction precluding The Toro Company and Exmark Manufacturing Co., Inc., from making, using, selling, and offering to sell lawnmowers equipped with platform suspension systems that infringe Scag's patent, U.S. Patent No. 8,186,475. This motion is granted on the condition that Scag posts adequate security. *See* Fed. R. Civ. P. 65(c).

### Background

In 1986, Metalcraft of Mayville purchased Scag, one of the world's largest independent manufacturers of commercial mowing equipment. Metalcraft manufactures Scag mowers in plants located in Mayville and West Bend, Wisconsin.

Operators of riding lawnmowers involved in commercial enterprises, such as landscaping and golf course maintenance, often operate the mowers for extended periods of time, day after day. This can be physically debilitating due to the mowers being driven across uneven terrain.

In 2010, Scag developed a suspended operator platform that greatly improved over existing prior art cushioning systems, many of which focused upon seat suspensions. These seat suspension configurations, however, left the operator susceptible to vibrations, shocks, and forces being transmitted through other components of the lawnmower, such as footrests. In order to better insulate the operator, Scag developed a suspended operator platform, which is disclosed and claimed in the '475 patent. The operator seat is mounted on a suspended operator platform that has the ability to absorb and damp shock impulses. The operator platform is attached via a linkage and shock absorption system to the frame of the lawnmower.

Shortly after developing this technology, Scag commercialized the system disclosed and claimed in the '475 patent, offering the suspended operator platform as a feature in its newly created Cheetah line consisting of lawnmowers with various sizes of cutting decks, i.e., 48", 52", 61", and 72". Scag's website explains that the "entire operator platform (seat and

- 2 -

foot plate) are suspended to deliver a smooth ride, with only three moving parts." Since its introduction in 2010, Scag has sold about 15,000 Cheetah units, generating gross revenue of about $30 million.

Scag sells its lawnmowers, including its Cheetah line, to distributors who in turn sell to dealers. Scag estimates that there are around 1100 dealers in its network. Dealers typically carry products from multiple manufacturers, so it is not uncommon for Scag lawnmowers to compete head-to-head on the dealer floor with competitors' lawnmowers, including Toro and Exmark lawnmowers. All three companies also have significant web presences, including web sites that tout the features and other aspects of their products.

In 2015, both Exmark and Toro introduced a mower with a suspended operator platform to compete with Scag's Cheetah line. Exmark announced a limited launch in a July 1, 2015 press release. Because of customer demand, Exmark subsequently announced in an October 21, 2015 press release that it was expanding the suspended operator platform for 2016 to additional lawnmower models. Exmark touts its suspended platform on the "Recent Innovations" page on its website. A promotional video provides a demonstration of the Exmark suspended platform system.

On November 2, 2015, Toro similarly announced the introduction of

- 3 -

"the all-new MyRIDE™ suspension system available on select Toro® Z-Master® zero-turn mowers." Toro's website also features a promotional video showing a detailed demonstration of the MyRIDE suspension system.

## Analysis

To obtain a preliminary injunction, a party must show that it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that an injunction is in the public interest. *See Luminara Worldwide, LLC v. Liown Elecs. Co. Ltd.*, 814 F.3d 1343, 1352 (Fed. Cir. 2016); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "No one factor, taken individually, is necessarily dispositive. … [T]he weakness of the showing regarding one factor may be overborne by the strength of others." *FMC Corp. v. United States*, 3 F.3d 424, 427 (Fed. Cir. 1993). However, "a movant cannot be granted a preliminary injunction unless it establishes *both* of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (emphasis in original). In that respect, there is no longer an "express presumption of irreparable harm upon a finding that a plaintiff [is] likely to succeed on the merits of a patent infringement claim." *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659

- 4 -

F.3d 1142, 1148 (Fed. Cir. 2011) (discussing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006)).

## I.   Likelihood of success

If the accused infringer "raises a substantial question concerning either infringement or validity," then the patentee "has not established that it is likely to succeed on the merits, and a preliminary injunction is not appropriate." *LifeScan Scotland, Ltd. v. Shasta Tech. LLC*, 734 F.3d 1361, 1366 (7th Cir. 2013).

Scag argues that it is likely to succeed in proving infringement of claims 11, 14, and 21. In opposition, the defendants focus on one claim limitation that they assert is missing from all of the asserted claims: that the operator platform supports "an entire body of an operator" during use. All of the accused mowers have steering controls connected to the chassis, not the suspended operator platform, which means that the platform does not support the rider's arms and hands. According to the defendants, Scag chose to use the term "entire body" of the operator to avoid prior art that Scag described as not supporting the entire body of the operator.

Scag counters that attaching the steering controls to the suspended operator platform is merely a preferred embodiment in the specification. "While claim terms are understood in light of the specification, a claim

- 5 -

construction must not import limitations from the specification into the claims." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012). "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)).

In this case, in the "Summary of the Invention" section, the specification states: "It is also *desired* to provide a suspended operator platform that suspends or isolates at least some controls from the rigid chassis of the ride-on mower. For instance, steering controls *may* be mounted on the suspended platform so as to move in unison with the suspended operator platform." The phrasing does not express the limiting intention required by the law.

Additionally, claims 1, 12, 20, and 26 contain express language directed to the inclusion of steering controls connected to the operator platform. Claim 12, for example, is for the "riding utility vehicle of claim 11, further comprising steering controls for directing movement of the utility vehicle, *the steering controls being connected to and moving in*

- 6 -

*unison with the operator platform*." This is a *dependent* claim, giving rise to the inference that the limitation in question is not present in claim 11, the *independent* claim. "Under the doctrine of claim differentiation, 'the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim.'" *Retractable Tech., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1312 (Fed. Cir. 2011) (Rader, C.J., dissenting in part) (quoting *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005)). The presumption is "especially strong when the limitation in dispute is the only meaningful difference between an independent claim and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enters. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003).

Accordingly, the Court agrees with Scag that the fact that the defendants' lawnmowers have steering controls attached to the chassis, as opposed to the operator platform, is not a defense to infringement. A person having ordinary skill in the art would understand the "entire body" limitation in reference to how a person sits in an ordinary chair. *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 957 (Fed. Cir. 2014) ("In construing a claim term, we look at the term's plain and ordinary meaning as

- 7 -

understood by a person of ordinary skill in the art"). Therefore, the defendants failed to raise a substantial question on infringement.

As to validity, defendants argue that certain prior art, U.S. Patent 3,420,568 ("Henriksson"), is an anticipatory reference with respect to claims 11 and 14. A prior art reference is anticipatory under 35 U.S.C. § 102(b) if it "disclose[s] each and every feature of the claimed invention, either explicitly or inherently." *Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1375 (Fed. Cir. 2006). Henriksson, however, discloses a heavy-duty truck with a driver's compartment, not an operator platform as described by claims 11 and 14. Henriksson is not an anticipatory reference.

Defendants also argue that claim 21 is obvious in light of Henriksson and an additional patent, JPS5569340 ("Sasaki"), directed to a shock absorber for the rear of a motorcycle. A patent "composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007). Defendants offer no reason, and the Court cannot imagine one, that a person of ordinary skill in this field would combine a motorcycle shock with a suspended truck cab and come up with a suspended operator platform. *Id.* at 418-19 ("it can be important to identify a reason that would have prompted a person of ordinary skill in

- 8 -

the relevant field to combine the elements in the way the claimed new invention does. This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense, is already known").

Defendants have failed to raise a substantial question on infringement or validity. Therefore, Scag is likely to succeed on the merits of its claim for patent infringement.

## II.    Irreparable harm

Irreparable harm is harm that no damages payment, however great, could address. Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012). There must be "a nexus between the asserted infringement and the market injury ...." *Apple, Inc. v. Samsung Elecs. Co., Ltd.*, 678 F.3d 1314, 1324 (Fed. Cir. 2012). A "mere showing" that Scag "might lose some insubstantial market share as a result of [the] infringement is not enough." *Id.* at 1324-25. Instead, a party "seeking injunctive relief must make 'a clear showing' that it is at risk of irreparable harm, which entails showing 'a likelihood of substantial and immediate irreparable injury.'" *Id.* at 1325

- 9 -

(quoting *Winter Nat.*, 555 U.S. at 22).

It is undisputed that prior to defendants' entry into the market, Scag owned about 100% of the market share for lawnmowers with suspended operator platforms. "Exclusivity is closely related to the fundamental nature of patents as property rights [and] is an intangible asset that is part of a company's reputation, ...." *Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013). Therefore, when "two companies are in direct competition against one another, the patentee suffers the harm – often irreparable – of being forced to compete against products that incorporate and infringe its own patented inventions." *Id.* In this context, it is worth noting, as the defendants concede, that customers in the riding lawnmower market are very brand loyal and potential lifetime customers. Indeed, some customers "prefer to purchase an entire line of products from the same manufacturer for consistency, such as common look, common parts, and common warranty." ECF No. 24, Declaration of Christopher Hannan, Toro's Senior Marketing Manager, ¶ 7. Thus, the damage to Scag is irreparable because it is impossible to quantify the damages caused by the loss of a potentially lifelong customer. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1363 (Fed. Cir. 2012) ("Direct competition in the same market is certainly

- 10 -

one factor suggesting strongly the potential for irreparable harm").

Defendants argue that Scag's motion should be denied because it is untimely. However, "a showing of delay does not preclude, as a matter of law, a determination of irreparable harm. A period of delay is but one circumstance that the district court must consider in the context of the totality of the circumstances." *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1457 (Fed. Cir. 1988). Scag first saw a lawnmower equipped with Toro's MyRIDE™ suspension system on October 22, 2015, at an industry show. Scag then acquired an infringing mower, investigated its claim, and moved for a preliminary injunction on May 5, 2016. The time lag was reasonable under the circumstances. Scag should not be penalized for doing its due diligence prior to filing suit.

## III.   Balance of hardships/public interest

Defendants identify the following hardships they would suffer if enjoined from selling lawnmowers equipped with the infringing platform suspension system: significant loss of sales and expected revenue, potential harm caused by failure to fulfill outstanding orders and/or costs associated with storage and transportation of enjoined products, and other unspecified harms, including reputational damages. In the absence of an injunction, however, Scag would be forced to "compete against its own patented

invention," a situation that "places a substantial hardship" on the patentee. *Robert Bosch*, 659 F.3d at 1156. The Court finds that the latter harm outweighs the former. Indeed, the harms identified by the defendants are those associated with losing a patent infringement lawsuit. At the preliminary stage, Rule 65(c) is designed to provide adequate security in the event that the defendants were wrongfully enjoined.

Finally, the public interest favors the issuance of an injunction. The Federal Circuit has "long acknowledged the importance of the patent system in encouraging innovation." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006). That incentive "would be adversely affected by taking market benefits away from the patentee and giving them to the accused infringer …." *Celsis*, 664 F.3d at 932. The public can continue obtaining the patented suspension system from Scag, or it can obtain other non-infringing mowers from the defendants.

***

Based on the foregoing, the Court orders that Scag's motion for a preliminary injunction [ECF No. 2] is **GRANTED**, subject to the posting of adequate security under Rule 65(c).

- 12 -

Dated at Milwaukee, Wisconsin, this **1st** day of August, 2016.

**BY THE COURT:**

**HON. RUDOLPH T. RANDA**
**U.S. District Judge**

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

_____

**METALCRAFT OF MAYVILLE, Inc.,**
**d/b/a SCAG POWER EQUIPMENT, Inc.,**

              **Plaintiff,**

   **v.**                                 **Case No. 16-CV-544**

**THE TORO COMPANY and**
**EXMARK MANUFACTURING Co., Inc.,**

              **Defendants.**
_____

## DECISION AND ORDER

On May 5, 2016, Metalcraft of Mayville, Inc., d/b/a Scag Power Equipment, filed this lawsuit and simultaneously moved for a preliminary injunction precluding The Toro Company and Exmark Manufacturing from making, using, selling, and offering to sell lawnmowers with platform suspension systems that infringe on Scag's patent, U.S. Patent No. 8,186,475. On August 1, Judge Pepper signed an order for Judge Randa granting Scag's motion on the condition that Scag post adequate security. On August 3, this case was reassigned to Magistrate Judge Duffin. On August 4, defendants appealed Judge Randa's order granting the motion for a preliminary injunction. On August 8, this case was reassigned to me due to non-consent.

Five motions are currently pending: (1) defendants' motion to dismiss for failure to state a claim, (2) defendants' expedited motion to stay the entry of the preliminary injunction until defendants' pending motion to dismiss and appeal have been decided, (3) plaintiff's expedited motion to set bond and enter an injunction order, (4) defendants' motion for leave to file a declaration, and (5) plaintiff's motion for leave to file a reply in

support of its motion to set a bond and for entry of a preliminary injunction. In the second motion, defendants argue that I should stay entry of the injunction until I decide their motion to dismiss. Defendants are correct that if the amended complaint fails to state a claim, then the injunction never should have been issued. Judge Randa, however, obviously thought that the plaintiffs do have a valid claim, otherwise he never would have granted the motion for a preliminary injunction. To clear up any lingering confusion, I will address the motion to dismiss now, using Judge Randa's reasoning as a backdrop.

> **I.      Motion to dismiss.**

When considering a motion to dismiss in a patent case, district courts apply the substantive law of the regional circuit. *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1355-56 (Fed. Cir. 2006). To survive a Rule 12(b)(6) motion, a complaint must include a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This means that the complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013). Well-pleaded facts are accepted as true, and all reasonable inferences are drawn in favor of the non-moving party. *Id.*

Judge Randa found that plaintiff was likely to succeed in proving infringement. In opposition, defendants emphasized the limitation in claims 11, 14, and 21 that the

operator platform supports "an entire body of an operator" during use. Defendants argued that the accused mowers do not infringe because they have steering controls connected to the chassis, not the suspended operator platform, which means that the platform does not support the rider's arms and hands. Judge Randa disagreed, finding that "attaching the steering controls to the suspended operator platform is merely a preferred embodiment in the specification." Decision and Order, ECF No. 30, at 5. Moreover, since other *dependent* claims have "express language directed to the inclusion of steering controls connected to the operator platform," the doctrine of claim differentiation "'gives rise to a presumption that the limitation in question is not present in the independent claim.'" *Id.* at 7 (quoting *Retractable Tech., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1312 (Fed. Cir. 2011) (Rader, C.J., dissenting in part)). Accordingly, Judge Randa agreed with plaintiff that "the fact that the defendants' lawnmowers have steering controls attached to the chassis, as opposed to the operator platform, is not a defense to infringement. A person having ordinary skill in the art would understand the 'entire body' limitation in reference to how a person sits in an ordinary chair." *Id.*

Defendants pursued the same line of argument in their motion to dismiss. Like Judge Randa, I am not persuaded. As to the remaining arguments in their motion to dismiss, defendants attempted to incorporate them by reference in their opposition to the motion for a preliminary injunction. Def.'s Br. in Opp., ECF No. 22, at 10 n.2. Judge Randa did not address those arguments. I will do so now.

Defendants argue that their mowers do not infringe claims 11 and 14 because they do not have a "front linkage," let alone a linkage connected between the chassis

3

and the "front portion" of the operator platform. *See* Howe Dec., ECF No. 21, Ex. A, '475 Pat., col.12, ll.6–9 (claiming "a suspension system connecting the operator platform to the chassis, the suspension system including (i) a front linkage that extends angularly between the chassis and a front portion of the operator platform . . . ."); *Id.*, col.12, 14. 30–31 (claiming "a linkage system connecting the front portion of the operator platform to the front portion of the chassis . . . .").[1] Defendants argue that the "front portion" is meant to be a "foot support tier." This, again, is only a preferred embodiment from the specification. Defendants also assert that the "linkage" required by claims 11 and 14 cannot include a spring or strut, as in the accused lawnmowers. Once again, the linkage shown in the specification is a preferred embodiment. Decision and Order, ECF No. 30, at 6 ("'Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction'") (citing *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004)).

Plaintiff also brought claims for indirect/induced infringement and willful infringement. Defendants argue that plaintiff failed to plausibly allege knowledge. *See Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, --- F.3d ----, 2016 WL 3124704, at *1 (Fed. Cir. June 3, 2016) ("proof of induced infringement requires not 'only knowledge of the patent' but also 'proof the defendant knew the [induced] acts were infringing'" (quoting *Commill USA, LLC v. Cisco Sys., Inc.*, --- U.S. ----, 135 S. Ct. 1920, 1926, 1928 (2015))); *K-Tec, Inc. v. Vita-Mix Corp.*, 696 F.3d 1364, 1378 (Fed. Cir. 2012) (elements

---

[1] I can consider the '475 patent without converting this motion into a motion for summary judgment because the patent is central to Scag's infringement claims. *See Albany Bank & Trust Co. v. Exxon Mobil Corp.*, 310 F.3d 969, 971 (7th Cir. 2002).

for willful infringement). Plaintiff alleges that defendants knew that their mowers infringed the '475 patent prior to the instant suit being filed. Am. Compl., ECF No. 16, ¶¶ 78–79, 98–99. This is enough to state a claim, especially combined with a plausible claim for direct infringement.

## II.    Motion to stay.

Since the motion to dismiss is now resolved, the only remaining aspect of this motion is the defendants' request to stay the entry of the preliminary injunction pending appeal. Federal Rule of Civil Procedure 62(c) provides that a district court may grant a stay pending appeal following entry of an order granting an injunction. "To determine whether to grant a stay, [courts] consider the moving party's likelihood of success on the merits, the irreparable harm that will result to each side if the stay is either granted or denied in error, and whether the public interest favors one side or the other." *In re A&F Enters., Inc. II*, 742 F.3d 763, 766 (7th Cir. 2014). If an appeal has no merit, the request for a stay should be denied. *Cavel Int'l, Inc. v. Madigan*, 500 F.3d 544, 547 (7th Cir. 2007). If, however, the appellants have some chance of success on appeal, courts apply a "sliding scale" approach, under which I weigh the likelihood of success and extent of irreparable harm to be suffered by appellants against the harm likely to be suffered by appellees if a stay is entered. *Id.*

In this context, the likelihood of success relates to "those matters that properly will be before the Federal Circuit on appeal of the preliminary injunction order." *Abbott Labs. v. Sandoz, Inc.*, 500 F. Supp. 2d 846, 849 (N.D. Ill. 2007). Judge Randa held, as discussed above, that plaintiff is likely to succeed on the merits of their infringement claims because the defendants failed to raise a substantial question on infringement.

5

Judge Randa also rejected defendants' arguments that certain prior art, including a heavy-duty truck with a driver's compartment and the combination of a truck with a motorcycle shock, were anticipatory references. Decision and Order, ECF No. 30, at 8 ("Defendants offer no reason, and the Court cannot imagine one, that a person of ordinary skill in this field would combine a motorcycle shock with a suspended truck cab and come up with a suspended operator platform."). As to the remaining factors for the issuance of injunctive relief, Judge Randa found that (1) the harm suffered by plaintiff is irreparable because of the loss of exclusivity and brand-loyal customers in the market for lawnmowers with suspended operator platforms; (2) plaintiff being forced to compete against its own patented invention outweighs the harm to defendants, primarily loss of sales; and (3) the public interest favors the issuance of an injunction because it promotes the market incentive of encouraging innovation through the patent system. *Id.* at 9–12.

I agree with Judge Randa's reasoning. Assuming, without deciding, that defendants have demonstrated some likelihood of success on appeal, the sliding scale approach still results in denial of the motion. Defendants complain, once again, about lost sales and revenues, but this is not irreparable harm. Moreover, as Judge Randa noted, "the harms identified by the defendants are those associated with losing a patent infringement lawsuit. At the preliminary stage, Rule 65(c) is designed to provide adequate security in the event that the defendants were wrongfully enjoined." *Id.* at 12. Issuance of the stay would also substantially injure plaintiff for the reasons identified in Judge Randa's opinion. "It is undisputed that prior to defendants' entry into the market, [plaintiff] owned about 100% of the market share for lawnmowers with suspended

6

operator platforms. 'Exclusivity is closely related to the fundamental nature of patents as property rights [and] is an intangible asset that is part of a company's reputation . . . .'" *Id.* at 10 (internal citation omitted). Finally, the public interest lies in enforcing plaintiff's right to capitalize on its patent, not protecting and allowing continuing infringement by defendants. "The public can continue obtaining the patented suspension system from [plaintiff], or it can obtain other non-infringing mowers from the defendants." *Id.* at 12.

### III.    Motion to set bond and enter injunction.

The purpose of an injunction bond is to give "security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). "When setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000). Defendants would not be automatically entitled to that amount, but "an error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.* (citing *W.R. Grace & Co. v. Rubber Workers*, 461 U.S. 757, 770 n.14 (1983)).

Plaintiff initially posited $200,000 as an adequate amount of security. In response, defendants argue that plaintiff should be required to post bond corresponding to the difference in price between mowers with suspended operator platforms and those without, $900, multiplied by the number of mowers estimated for the next two years, which equals $10,620,000. Though, the evidence submitted by defendants indicates that the difference in price is $800, not $900. Finkner Decl., ECF No. 42, ¶ 7; Hannan Decl., ECF No. 44-1, ¶ 6. That aside, plaintiff objects to defendants' approach because

7

it appears to rely upon gross revenue numbers. Instead, plaintiff argues that the proper inquiry should be on potential lost profits. Assuming a profit level of 10%, *see* Brookman Decl., ECF No. 46, ¶ 6, plaintiff posits a lost profits bond of $1,062,000—10% of $900 times 11,800, the claimed number of sales. I agree with this approach generally, but find that the amount may need to be pushed a bit higher to account for other factors, including "lost market share and associated costs of relaunch." *Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1385 (Fed. Cir. 2006). I will set the bond at $1,000,000, but I am open to conducting further proceedings on this issue in accordance with the guidance set forth herein.

### IV.    Motions for leave to file declaration and to file a reply.

Since I considered both of the proposed filings, these motions are granted *nunc pro tunc*.

**THEREFORE, IT IS ORDERED** that defendants' motion to dismiss (ECF No. 19) is **DENIED**.

**IT IS FURTHER ORDERED THAT** defendants' motion to stay (ECF No. 32) is **DENIED**.

**IT IS FURTHER ORDERED THAT** plaintiff's motion to set bond and enter an injunction order (ECF No. 37) is **GRANTED**. Bond is set at $1,000,000 and should be posted within **seven (7) days** of the date of this Order. Defendants are enjoined from making, using, selling, and offering to sell lawnmowers equipped with the infringing platform suspension system in accordance with Judge Randa's August 1, 2016 Decision and Order, ECF No. 30.

8

**IT IS FURTHER ORDERED THAT** defendants' motion for leave to file a declaration (ECF No. 44) is **GRANTED**.

**IT IS FURTHER ORDERED THAT** plaintiff's motion for leave to file a reply (ECF No. 45) is **GRANTED**.

Dated at Milwaukee, Wisconsin, this 18th day of August, 2016.

s/ Lynn Adelman

_____
LYNN ADELMAN
District Judge

9

**PROOF OF SERVICE**

I hereby certify that on September 14, 2016, copies of Corrected

Defendants-Appellants' Opening Brief was served via CM/ECF upon the

following:

Adam L. Brookman
Sarah M. Wong
Michael T. Griggs
BOYLE FREDRICKSON SC
840 N. Plankinton Avenue
Milwaukee, WI 53202

Attorneys for Plaintiff-Appellee


                                              s/Rachel C. Hughey
                                              Rachel C. Hughey

68

## CERTIFICATE OF COMPLIANCE
## PURSUANT TO FEDERAL CIRCUIT RULE 32(a)

Certificate of Compliance with Type Volume Limitation, Typeface Requirements, and Type Style Requirements:

1.    This brief complies with the type volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

   - this brief contains 12,693 words, excluding parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii)

2.    This brief complies with the typeface requirements of the Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   - this brief has been prepared in a proportionally spaced typeface, using Microsoft Word 14 Times New Roman font.

September 14, 2016

By: s/Rachel C. Hughey
        Anthony R. Zeuli
        Rachel C. Hughey
        MERCHANT & GOULD PC
        3200 IDS Center
        80 South Eighth Street
        Minneapolis, MN 55402
        (612) 332-5300

*Attorneys for Defendants-Appellants*
*The Toro Company and Exmark*
*Manufacturing Co., Inc.*

69