**CASE NO. 2016-2433, 2016-2514**

---

**UNITED STATES COURT OF APPEALS
FOR THE FEDERAL CIRCUIT**

---

METALCRAFT OF MAYVILLE, INC.,

DBA SCAG POWER EQUIPMENT

Plaintiff-Appellee,

v.

THE TORO COMPANY

and

EXMARK MANUFACTURING CO., INC.,

Defendants-Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN IN CASE NO. 2:16-CV-00544

---

**BRIEF OF PLAINTIFF-APPELLEE**

---

Michael T. Griggs
Adam L. Brookman
Sarah M. Wong
Boyle Fredrickson, S.C.
840 N. Plankinton Avenue
Milwaukee, WI 53203
(414) 225-9755

Attorneys for Plaintiff-Appellee
Metalcraft of Mayville, Inc.

October 12, 2016

## CERTIFICATE OF INTEREST FOR APPELLEE

The undersigned counsel for the appellee Metalcraft of Mayville, Inc. DBA

Scag Power Equipment certifies the following:

1. The full name of every party represented by me is:

   Metalcraft of Mayville, Inc. DBA Scag Power Equipment.

2. The appellee named in the caption is the real party in interest.

3. No publicly held corporation owns 10% or more of Metalcraft of Mayville, Inc. DBA Scag Power Equipment.

4. The names of all law firms and the partners or associates that appeared for the plaintiff-appellee in the district court proceeding or are expected to appear for them in this court are:

   Michael T. Griggs, Adam L. Brookman, Sarah M. Wong of Boyle Fredrickson, S.C.


October 12, 2016                    /s/Michael T. Griggs

                                    Michael T. Griggs
                                    *Attorney for Appellee*

# **Table of Contents**

Table of Contents .................................................................................. i

Table of Authorities ............................................................................ iii

Statement of Related Cases ...................................................................v

Statement of the Issues.........................................................................1

Statement of the Case............................................................................1

I.    Background facts relating to Scag's development of the technology...........3

II.   Background facts relating to the procedural history .....................................9

Summary of the Argument...................................................................11

I.    The district court properly construed the "entire body" limitation.............14

A.    The "entire body" limitation is separate and independent from the "steering controls" limitation despite Toro's multiple efforts to conflate the two ...................................................................18

B.    Toro erroneously characterizes the '475 patent as disclosing a single solution to a single problem ..................................................19

C.    Any construction of the "entire body" limitation that implicitly requires steering controls violates bedrock legal principles ...................................22

1.    A claim construction of the "entire body" limitation that precludes steering controls attached to the chassis violates the doctrine of claim differentiation...........................................................................22

2.    A claim construction of the "entire body" limitation that precludes steering controls attached to the chassis impermissibly imports a limitation from the specification...........................................................25

II.   The district court properly found that Toro failed to raise a substantial question as to infringement.........................................................32

III.    The district court properly found that Toro failed to raise a substantial question as to invalidity ............................................................................40

IV.    There are alternate grounds for affirming the district court's finding that Toro failed to present a substantial question as to validity.........................44

V.    The district court did not abuse its discretion in finding irreparable harm to Scag, balancing the hardships of Scag and Toro, or evaluating the public interest ........................................................................................................46

VI.    The district court complied with Rule 65(d)(1)(C).....................................49

Conclusion ..........................................................................................................50

Certificate of Compliance with Rule 32(a)...........................................................52

# Table of Authorities

## Cases

*A.B. Dick Co. v. Burroughs Corp.*,
  713 F.2d 700 (Fed. Cir. 1983) .................................................................39

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
  805 F.3d 1368 (Fed. Cir. 2015), *cert. denied,* 136 S. Ct. 1661 (2016) ...............23

*Amstar Corp. v. Envirotech Corp.*, 730 F.2d
  1476 (Fed. Cir. 1984) ...........................................................................39

*Celgard, LLC v. LG Chem, Ltd.*,
  624 F. App'x 748 (Fed. Cir. 2015) .......................................................48

*Deere & Co. v. Bush Hog, LLC*,
  703 F.3d 1349 (Fed. Cir. 2012) ...........................................................25

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
  355 F.3d 1327 (Fed. Cir. 2004) ...........................................................26

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
  755 F.3d 1367 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 719, 190 L. Ed. 2d 463
  (2014) ...................................................................................................26

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004) .............................................................26

*Oakley, Inc. v. Sunglass Hut Int'l*,
  316 F.3d 1331 (Fed. Cir. 2003) ...........................................................43

*Penda Corp. v. United States*,
  29 Fed. Cl. 533 (1993) .........................................................................32

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005) ...........................................................22

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
  659 F.3d 1142 (Fed. Cir. 2011) ...........................................................48

*ScriptPro LLC v. Innovation Assocs., Inc.*,
  2016 WL 4269920 (Fed. Cir. Aug. 15, 2016) ................................................ 24, 27

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
  775 F.2d 1107 (Fed. Cir. 1985) ............................................................33

*SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*,
  336 F.3d 1298 (Fed. Cir. 2003) ............................................................22

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002) ............................................................26

*Thorner v. Sony Computer Entm't Am. LLC*,
  669 F.3d 1362 (Fed. Cir. 2012) ............................................................24

*Vectra Fitness, Inc. v. Icon Health & Fitness, Inc.*,
  272 F. Supp. 2d 1164 (W.D. Wash. 2003) ............................................................39

*Vulcan Eng'g Co., Inc. v. Fata Aluminium, Inc.*,
  278 F.3d 1366 (Fed. Cir. 2002) ............................................................39

**Rules**

Rule 65(d)(1)(C), Fed. R. Civ. P. ...................................................... 47, 48

## Statement of Related Cases

Pursuant to Federal Circuit Rule 47.5, Appellee Metalcraft of Mayville, Inc. states as follows:

(a) There have been no previous appeals in this proceeding.

(b) There are no cases pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## **Statement of the Issues**

1.    Whether the district court abused its discretion by entering a
preliminary injunction.

2.    Whether the district court abused its discretion in construing the
asserted claims, rejecting Toro's assertion that the claims must include
limitations not expressly found in the claims.

3.    Whether the district court abused its discretion in finding that Toro
failed to raise a substantial question as to the validity of claims 11 and
14 as anticipated by Henriksson.

4.    Whether the district court abused its discretion in finding that Toro
failed to raise a substantial question as to the validity of claim 21 as
obvious over Henriksson in view of Sasaki.

5.    Whether the district court abused its discretion in finding that Scag
would be irreparably harmed, that the balance of the hardships
favored Scag, and the public interest favored an injunction.

6.    Whether the district court satisfied the requirements of Rule
65(d)(1)(C) in its order granting the preliminary injunction.

## **Statement of the Case**

The Defendants (hereinafter collectively "Toro") seek to overturn a
preliminary injunction that was approved by three different judges of the Eastern

District of Wisconsin.[1]  Yet, in its motion to this Court to stay the district court proceedings, Toro contends it has demonstrated a "high likelihood of success on the merits."  It has not.  The decisions of the district court are properly grounded in the facts and the law and rely on correct interpretations of the claims.  Moreover, Toro itself confirmed that Plaintiff (herein referred to as "Scag") will suffer irreparable harm since customers in the parties' industry tend to be lifetime customers.

Scag generally disagrees with the argument and characterizations that Toro intersperses throughout the Statement of the Case section of its brief.  For example, in Toro's Introduction, Toro repeatedly describes this case as "remarkable" due to what Toro perceives as errors made by the district court.  Toro further describes this case as a "garden variety patent infringement suit," which seems to be an attempt to marginalize Toro's infringement and the impact Toro's infringement has had on Scag.

Further, Toro has not provided a complete or even accurate picture as to Scag's development of the technology, Toro's accused lawnmowers, or the procedural history of the case, which are explained below.  Scag also takes issue

---

[1] Judge Pamela Pepper signed the preliminary injunction decision and order for Judge Rudolph Randa, whose signature appears at the end of the decision and order.  (Appx004)  Judge Lynn Adelman reviewed and endorsed Judge Randa's reasoning in denying Toro's motion to dismiss and for a stay.  (Appx019-027)

with Toro's characterization of the inventive aspects of the patent in issue, U.S. Patent 8,186,475 ("the '475 patent"), as well as Toro's characterization of a number of facts as "undisputed."

## I.  Background facts relating to Scag's development of the technology

Metalcraft of Mayville ("Metalcraft") was established in Mayville, Wisconsin in 1922 as the Peerless Traveling Goods Company with luggage as its principle product.  (Appx099)  Over time, the company's focus shifted to contract sheet metal fabrication.  *Id*.  Today, Metalcraft employs over 500 factory and office personnel in two plants:  the Mayville plant is over 400,000 square feet and the plant in West Bend, Wisconsin is about 230,000 square feet.  *Id.*

In 1986, Metalcraft purchased Scag, a manufacturer of commercial lawn mowing equipment.  Since Metalcraft's purchase, Scag has become one of the largest independent manufacturers of commercial mowing equipment in the world.  Scag's innovation and quality are recognized throughout the industry.  (Appx100)

Most people are generally familiar with riding lawnmowers, which are typically used to cut large areas of grass.  Operators of riding lawnmowers involved in commercial enterprises – e.g., landscaping and golf course maintenance – often operate the mowers for extended periods of time, day after day.  (Appx007, Appx041, 1:10-13)  This prolonged operation can be physically debilitating because operators are exposed to shocks, vibrations, and other forces

that are generated by the lawnmower during use that result from driving the lawnmower across uneven terrain.  (Appx007, Appx041, 1:14-18)

In 2010, Scag developed a suspended operator platform that greatly improved over existing prior art cushioning systems, many of which focused upon seat suspensions.  (Appx007, Appx041, 1:25-33)  These seat suspension configurations, however, left the operator susceptible to vibrations, shocks, and forces being transmitted through other components of the lawnmower, such as footrests.  *Id.*  While some prior art systems included suspended operator platforms, those designs were unstable, causing the operator platform to roll about a longitudinal axis, yaw, and transversely sway.  (Appx041, 1:40-44)  Further, prior art systems did not provide for adjustment of the suspension system to accommodate variances in operator preference and weight.  (Appx041, 2:12-21)

In order to better insulate the operator from unwanted shocks, vibrations, and other forces, and to reduce rolling, yawing, and pitching of the operator platform, Scag developed a suspended operator platform, which is disclosed and claimed in the '475 patent.  (Appx100)  In general terms, the operator seat is mounted on a suspended operator platform that has the ability to absorb and damp shock impulses.  The operator platform is attached to the frame of the lawnmower via a linkage and shock absorption system ("shock system") in a manner that not only substantially isolates an operator from shock, but also keeps the platform

more stable to avoid nose diving, yawing, and rolling.  In the exemplary

embodiment shown below, the front linkage connects the front of the operator

platform to the frame and the rear linkage connects the rear of the operator

platform to the frame.



The shock system in this embodiment includes a single coil-over type shock

absorber (i.e., a shock absorber having a spring and a damper) that is attached at

one end to the operator platform and at the other end to the frame to absorb shocks

and vibrations that otherwise would be translated to the operator sitting on the

platform.  Scag also developed an adjustability feature that enables an operator to

adjust the stiffness of the suspension system to accommodate differences in preference and operator weight.

Shortly after developing this technology, Scag commercialized it, offering the suspended operator platform with adjustable stiffness settings as features in its newly-created Cheetah line consisting of lawnmowers with various sizes of cutting decks, i.e., 48", 52", 61" and 72". (Appx007, Appx100)  The 52" Cheetah is shown below (the deck size is not relevant to the '475 patent or to Scag's infringement claims here) (Appx057):



As explained on Scag's website, "[t]he entire operator platform (seat and foot plate) are suspended to deliver a smooth ride, with only three moving parts." (Appx100)

Since its introduction in 2010, Scag's Cheetah line, with the suspended operator platform, has been a great success.  Scag has sold about 15,000 Cheetah

units, generating gross revenue of about $30 million.  (Appx008, Appx100)  Scag

sells its lawnmowers, including its Cheetah line, to distributors who in turn sell to

dealers.  *Id.*  Scag estimates that there are around 1100 dealers in its network.  *Id*.

Dealers typically carry products from multiple manufacturers, so it is not

uncommon for Scag lawnmowers to compete head-to-head on the dealer floor with

competitors' lawnmowers, including Toro and Exmark lawnmowers.  *Id.*

Given the head-to-head competition on the dealership floor, it is no

coincidence that Toro and Exmark introduced a suspended operator platform to

compete with Scag's Cheetah line.  Exmark appears to have announced a limited

launch of its suspended operator platform in a July 1, 2015 press release.

(Appx008, Appx101)  Then, due to apparent customer demand, Exmark

subsequently announced in an October 21, 2015 press release that it was expanding

the suspended operator platform for 2016 to additional lawnmower models.  *Id*.

One of Exmark's lawnmowers featuring the suspended platform is shown

below.  (Appx059)  Additionally, Exmark's promotional video provides a

demonstration of the Exmark suspended platform system which shows the features

establishing the infringement of the '475 patent.  (Appx101, Appx540)



Toro appears to have first announced its suspension system in a November 2, 2015 press release, stating that "The Toro Company is excited to introduce the all-new MyRIDE™ suspension system available on select Toro® Z-Master® zero-turn mowers." (Appx101)  One example of a riding lawnmower featuring the MyRIDE suspension system is shown below.  (Appx060)  Additionally, Toro's website also features a promotional video providing a detailed demonstration of the infringing Toro MyRIDE suspension system.  (Appx101, Appx541)

 

Prior to Toro's and Exmark's recent introduction of a suspended operator platform, the district court found that Scag owned about 100% of the market for riding lawnmowers with suspended operator platforms. (Appx015, Appx101)

## II.     Background facts relating to the procedural history

As noted above, Scag filed a complaint for patent infringement along with its motion for preliminary injunction on May 5, 2016.  (Appx103)  The complaint and preliminary injunction motion were served on May 10.  *Id.*  On May 31, rather than respond to the preliminary injunction motion, Toro sought to delay the district court's consideration of Scag's preliminary injunction motion by filing a request for a two month extension to file its response.  *Id.*  Toro stated that the extension of time was necessary to take at least five depositions, serve document requests, and pursue additional written discovery.  (Appx276)  The district court denied Toro's request for discovery and set a briefing schedule that still gave Toro an additional

24 days to respond to Scag's preliminary injunction motion beyond the 21 days afforded under the local rules. (Appx003)  Thus, Toro had 45 days from the date of service of the preliminary injunction motion to marshal evidence and respond.

At the time it sought its extension of time to respond to Scag's preliminary injunction motion, Toro also filed a motion to dismiss Scag's complaint.  Rather than give in to Toro's attempt to delay the proceedings by fighting the motion to dismiss, Scag filed an amended complaint.  (Appx003)  Yet, Toro filed a second motion to dismiss asserting that Scag failed to allege facts supporting a plausible infringement claim based on Toro's ideas of claim construction, including the same claim construction it asserted in response to Scag's motion for preliminary injunction. *Id*.

On August 1, 2016, Judge Pamela Pepper signed an order for the presiding judge, Rudolph Randa, granting Scag's motion for preliminary injunction. (Appx004)  The decision stated that the injunction was contingent upon Scag's posting of a bond.  Immediately thereafter, this case was reassigned to Judge Lynn Adelman due to the unavailability of Judge Randa.  (Appx004)

Toro filed a notice of appeal and moved for a stay of the injunction. (Appx004)  Judge Adelman denied Toro's motion for a stay, entered the injunction, and set the bond amount at $1,000,000.  (Appx026)  He also denied Toro's motion to dismiss, and in doing so relied on and endorsed Judge Randa's

reasoning in Judge Randa's grant of Scag's preliminary injunction motion, stating, "Defendants pursued the same line of argument in their motion to dismiss. Like Judge Randa, I am not persuaded." (Appx021) Later in his decision, after identifying Judge Randa's reasons for granting the preliminary injunction, Judge Adelman denied Toro's request for a stay stating, "I agree with Judge Randa's reasoning. Assuming, without deciding, that defendants have demonstrated some likelihood of success on appeal, the sliding scale approach still results in denial of the motion." (Appx024)

## Summary of the Argument

Toro seeks to overturn the preliminary injunction granted with input from three judges in the U.S. District Court for the Eastern District of Wisconsin. In so doing, Toro denigrates the district court's claim construction and then, substituting its own flawed reasoning that disregards bedrock principles of claim interpretation, impermissibly reads limitations into the asserted claims. When the claims are properly construed, without imported limitations, it is clear that Toro infringes the '475 patent.

All the asserted claims include the claim element, "an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle." Toro seeks to read this claim element as including or requiring the presence of steering controls mounted on the suspended operator platform.

According to Toro, the term "entire body of an operator" should be construed as "the torso, the feet, the legs, hands and arms of an operator, which means the platform must also include the 'controls, or components other than the seat that are in contact with the operator.'"[2]  Toro Appeal Brief at 36-37.  In order to arrive at this construction, Toro assumes, without any evidence, that the steering controls shown in the embodiment described in the '475 patent support the hands and arms of the operator during use.  This construction also ignores the well-established doctrines of claim differentiation and the prohibition against importing limitations of a preferred embodiment into the claims.   With this contorted construction in hand, Toro argues that it does not infringe the '475 patent.

More specifically, Toro claims that the term "the entire body of the operator" found in each of the asserted claims requires the inclusion of steering controls attached to the suspended operator platform because that is consistent with a preferred embodiment that is shown in the '475 patent, even though claims 11, 14, and 21 do not require steering controls.  This argument is flawed.

First, Toro assumes, without any evidence of any kind, that when a person sits on a suspended operator platform as claimed in the '475 patent, and grasps the steering controls, the claimed platform does not support the entirety of that person's body.  In other words, Toro appears to argue, without pointing to anything

---

[2] Toro presents this construction for the first time on this appeal.

in the '475 patent or in the extrinsic evidence that it has proffered, that the steering controls support some portion of the operator's body. Toro's unsupported assumption is rebutted by the '475 patent itself, which describes the steering controls as a "control system" that may optionally be attached to the operator platform. It does not describe the steering controls as being any part of a support system for the operator's body.

Yet, having made the assumption about the steering controls, Toro urges this Court to read the disclosure of the preferred embodiment, which describes the steering controls as attached to the platform, as the required form of the claimed invention in all cases. However, the patent specifically states that mounting the steering controls to the operator platform is something that "may" be done, not something that *must* be done. Thus, the disclosure of the preferred embodiment with the steering controls mounted to the operator platform cannot rise to the level of an expression of manifest exclusion or an express disclaimer of claim scope. Claims 11, 14 and 21, which do not explicitly require steering controls, cannot be interpreted as requiring steering controls attached to the operator platform. Thus, the fact that Toro's lawnmowers have steering controls attached to the chassis is not a defense to infringement. The district court recognized this glaring deficiency in Toro's argument and set forth a well-reasoned analysis of the facts and the law supporting its conclusions.

Toro also criticizes the court for failing to accept Toro's scant invalidity arguments. However, the prior art relied upon by Toro simply does not anticipate or render obvious the claimed invention.

Finally, Toro argues that Scag will suffer no irreparable harm since this is nothing more than a "garden variety patent infringement suit." Toro Appeal Brief at 14. However, Toro ignores the testimony of its own marketing and product managers, who both acknowledge that one sale to a customer can result in maintaining that customer for life. (Appx015, Appx432, Appx435) In other words, each sale Toro makes at Scag's expense is a sale that may cost Scag a future customer for life. The district court properly found this to constitute irreparable harm to Scag. (Appx015)

## Argument

### I.    The district court properly construed the "entire body" limitation

Claim construction is evaluated *de novo*. However, given that the preliminary injunction was premised on the district court's claim construction, the court's claim construction is relevant.

Scag has asserted claims 11, 14, and 21 against Toro. Each claim is directed to a riding utility vehicle having a chassis that supports a drive train, a seat, an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle, and a suspension system connecting the operator platform

to the chassis.  Toro claims that the proper interpretation of the term "entire body" leads to a conclusion that Toro does not infringe the '475 patent.

The district court evaluated the "entire body" limitation, and held that "[a] person having ordinary skill in the art would understand the 'entire body' limitation in reference to how a person sits in an ordinary chair" (Appx012), which is consistent with the term's plain and ordinary meaning.  At a basic level, there are two supports for a person's body when they are sitting on a chair that is on the floor – the seat of the chair that supports the torso, arms, and hands, and the floor that supports the feet.  Thus, the "entire body" of a person sitting in a conventional chair is supported by the seat and by the floor (here the operator platform is analogous to the floor in a conventional setting).  Given the manner of use of the term in the claims, and the use of the term in the specification of the '475 patent, this determination by the district court was entirely reasonable.

The specification supports the district court's interpretation, describing a preferred embodiment of the operator platform, which includes a "seat support tier" and a "foot support tier."  (Appx043; 6:1-6)  Thus, in order for the operator platform to support the "entire body" of the operator when the operator is seated in the seat, it must support the torso, arms, hands and the feet.  This interpretation also harmonizes with the '475 patent's distinction over prior art devices featuring a

suspension system for a seat, but where the operator's feet are supported by the chassis and thus subject to additional vibration.

The specification explains what it means to "support" the entire body of the operator:

> [S]uspension system 100 is configured to support an entire body of the operator, the operator platform 70, and the components attached to the operator platform 70 such as steering controls 55. A combined weight of all of these defines a sprung weight that is supported by the suspension system 100.

(Appx043, 6:7-12)   Thus, the specification describes supporting the *weight* of the entire body of the operator as well as the *weight* of certain other components of the lawnmower.   Moreover, the '475 patent distinguishes other prior art systems, noting that they needed to be "sufficiently robust to support the entire chassis and everything supporting on it, including the seat, the operator, the mower deck, the drive train, etc." (Appx041, 2:1-4)   Accordingly, the limitation is satisfied where the operator platform supports the weight of the operator (including the hands and arms) during use.   The claimed invention contrasts with the prior art systems discussed in the '475 patent where only the seat is supported by a suspension system and the feet are supported by the chassis.

Toro argues that the district court's construction is wrong because it somehow does not account for the "hands and arms" of the operator.   As stated

above, the district court construed the entire limitation as follows: "[a] person having ordinary skill in the art would understand the 'entire body' limitation in reference to how a person sits in an ordinary chair." Toro argues that the district court's construction "includes the operator's feet and legs but excludes the operator's hands and arms," Toro Appeal Brief at 35. Toro fails to explain *how* the district court's construction can be interpreted as excluding an operator's hands and arms. Contrary to Toro's misguided interpretation of the district court's claim construction, when a person sits in an ordinary chair, the person's hands and arms are supported by the chair. Toro's own advertising materials show a seat with armrests. Those armrests support the arms of the operator in the same manner as armrests employed by an ordinary chair.

Finally, Toro argues that "[t]he effect of the court's construction was to read 'entire body of an operator' out of the claim because it merely requires support of that portion of an operator that the seat and footrest already accomplishes." Toro Brief at 36-37. However, the claims require an operator platform "that supports the seat *and* an entire body of an operator." Thus, supporting the seat and supporting the entire body of an operator are two separate requirements of the claims.

The district court construed the "entire body" limitation in reference to how a person's body is supported when sitting in an ordinary chair, i.e., the torso

(which includes the arms and hands) is supported by the seat and the feet are

supported by the floor.  Thus, the "entire body" limitation is not rendered

superfluous by the district court's construction because the operator platform must

support the operator's feet *and* torso (indirectly via the seat), just as the floor

supports the feet *and* torso (indirectly via the seat) when a person sits in an

ordinary chair.

### A.  The "entire body" limitation is separate and independent from the "steering controls" limitation despite Toro's multiple efforts to conflate the two

Claims 11, 14 and 21, which are at issue here, include the "entire body"

limitation.  In trying to avoid infringement, Toro impermissibly attempts to

incorporate steering controls into the "entire body" limitation, despite the fact that

steering controls are not recited in claims 11, 14 and 21 and that the doctrine of

claim differentiation compels a conclusion that these controls are not implicit in

claims 11, 14 and 21.

The specification does not describe steering controls as a support structure

for the operator.  On the contrary, as the name suggests, the steering controls are

described as a mechanism for steering the vehicle.  (Appx043, 5:1-32)  As

discussed above, a suspension system supports the weight of the operator platform,

the seat, the entire body of the operator, and any controls attached to the operator

platform.  (Appx043, 6:7-12)  The steering controls are not a support structure (and

there is no evidence in the record that they are), nor does the '475 patent state or imply that they are required to be attached to the operator platform.

The specification describes the steering controls as *optionally* mounted to the suspended operator platform.  (Appx041, 2:37-41) ("steering controls *may be* mounted on the suspended platform so as to move in unison with the suspended operator platform") [emphasis added].  Thus, the specification clearly contemplates an embodiment having a suspended operator platform that supports the entire body where the steering controls *are not* mounted to the operator platform.  And this disclosure is consistent with claims 11, 14, and 21 at issue here, which require an operator platform that supports an entire body of the operator while making no mention of steering controls whatsoever.

## B.    Toro erroneously characterizes the '475 patent as disclosing a single solution to a single problem

Toro's characterization of the prior art and what it describes as Scag's singular "solution" to "the problem" found within the prior art, ignores what the '475 patent actual states.  *See, e.g.,* Toro Appeal Brief at 15 ("[Scag] described what it saw as *the problem* with the prior art" relating to exposure of the operator to shock loads during operation) [emphasis added]. The reality is that the '475 patent identifies a variety of deficiencies of prior art lawnmower designs and offers various solutions to those problems.

For example, when addressing U.S. Patent Application Publication No. 2006/0290080 to Scheele – a reference that Toro particularly focuses upon – the '475 patent explains how the configuration of the Scheele suspension system, would "allow the platform to roll about a longitudinal axis, yaw, and sway" which could "lead to oscillations of the platform relative to the chassis." (Appx041, 1:40-50) And while the '475 patent also cites the disadvantage of having steering controls mounted on the chassis, it provides two different reasons for the disadvantage: 1) relative movements between the operator and steering levers can give the steering levers a meandering feel during use; and 2) mounting the steering levers directly to the chassis allows vibrations, or shock-type or other loads to be transmitted through the steering levers and into the arms of the operator. (Appx041, 1:50-60)

The '475 patent also discusses a prior art design employing a chassis suspension system, which supports the seat, the operator, the mower deck, the drive train, and the chassis itself. (Appx041, 2:1-5) This design is described as "complex, expensive, and requires substantial maintenance" and can result in the mower deck nose diving or pitching downwardly into the grass, resulting in "scalping" or an undesirably short cut. (Appx041, 1:66-2:10) The design also requires the suspension to "be sufficiently robust to support the entire chassis and everything supporting [sic] on it." *Id.*

The '475 patent further explains that the prior art suspension systems provided "non-adjustable stiffness" that could not accommodate changing needs relating to the operator's body type and the nature of the terrain over which the vehicle was operated. (Appx041, 2:12-21)  The '475 patent addresses this deficiency by offering a stiffness adjuster to accommodate for body weight differences and user preferences (Appx041, 2:42-45), which may include a fine stiffness adjuster component and a coarse stiffness adjuster component.  (Appx041, 2:55-62)

In its limited description of the prior art and the '475 patent, Toro neglects to mention the linkage system (claimed in claims 11 and 14) and the stiffness adjuster (claimed in claim 21) as aspects of the claimed invention.  Instead, Toro attempts to artificially constrict the nature of the invention so that it can argue that the specific embodiment disclosed in the '475 patent, which shows steering controls mounted to the operator platform, is "the invention" of the '475 patent.  *See, e.g.*, Toro Appeal Brief at 40.  However, as discussed above, there are numerous inventive aspects of the suspended operator platform that are disclosed and claimed in various claims of the '475 patent, such as the linkage system and the stiffness adjuster, features that Toro concedes are embodied in its lawnmowers.  Accepting Toro's flawed reasoning would read every inventive or beneficial aspect of the lawnmower disclosed in the '475 patent into every claim.

**C.    Any construction of the "entire body" limitation that implicitly requires steering controls violates bedrock legal principles**

Toro argues that its lawnmowers do not satisfy the "entire body" limitation because the lawnmowers have steering controls mounted to the chassis, not the suspended operator platform.  This construction of the "entire body" limitation requiring steering controls mounted to the operator platform would contradict the specification and run afoul of bedrock principles of claim interpretation.

**1.    A claim construction of the "entire body" limitation that precludes steering controls attached to the chassis violates the doctrine of claim differentiation**

A construction that requires attaching steering controls to the operator platform violates the doctrine of claim differentiation with respect to independent claim 11 and dependent claim 12.  Under the doctrine of claim differentiation, the presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005).  This presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim. *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.,* 336 F.3d 1298, 1303 (Fed. Cir. 2003).  That is precisely the situation here with respect to claim 11, where the only

difference between claim 11 and claim 12, which depends from claim 11, is that claim 12 requires steering controls that are connected to and move with the operator platform.

Though Toro argues otherwise, the addition of steering controls in claim 12 is the only "meaningful" difference between claim 11 and claim 12, as the requirement that the steering controls move in unison with the platform relates directly to the steering controls and therefore cannot be characterized as separate and distinct from the steering controls limitation.

In order to overcome the presumption that steering controls mounted to the operator platform are not a limitation of claims 11, 14, and 21, Toro must identify an expression of manifest exclusion or an express disclaimer of claim scope in the patent or the patent's prosecution history. *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1376 (Fed. Cir. 2015), *cert. denied,* 136 S. Ct. 1661 (2016). However, no such indication of exclusion appears in the patent specification or prosecution history (which is not of record for purposes of this appeal). To the contrary, the specification describes mounting of the steering controls on the operator platform as optional.

Toro points to the specification's discussion of prior art vehicles having steering controls attached to the chassis, stating that such a mounting "can give the steering levers a meandering feel during use, which *may* not be desirable."

(Appx042; 1:50-56) [emphasis added]. However, "[m]ere criticism of a particular embodiment encompassed in the plain meaning of a claim term is not sufficient to rise to the level of clear disavowal." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). "[T]here must be clear and unmistakable disclaimer." *Id.* Given that the same prior art was also discussed with respect to its inability to prevent oscillations, and to control roll, yaw and pitch, there is no basis to conclude that steering controls mounted on the operator platform are a necessary element of the invention. Thus, to the extent the cited discussion of the prior art constitutes "criticism" of that configuration – which is questionable – it does not constitute the "clear and unmistakable disclaimer" required for disavowal of claim scope. *See ScriptPro LLC v. Innovation Assocs.*, *Inc.*, 2016 WL 4269920 (Fed. Cir. Aug. 15, 2016)*, *4 ("mere recognition in the specification that an aspect of a prior art system is 'inconvenient' does not constitute 'disparagement' sufficient to limit the described invention – especially where the same specification expressly contemplates that some embodiments of the described invention incorporate the 'inconvenient' aspect").

When the inventors of the '475 patent desired to claim controls attached to the operator platform, they used explicit language describing that configuration in the claims. For example, each of claims 1, 12, 20, and 26 include express language directed to the inclusion of steering controls connected to the operator platform:

"steering controls for directing movement of the utility vehicle, the steering controls being connected to and moving in unison with the operator platform."[3]

Claims 1, 20, and 26 also each include the "entire body" limitation in addition to the steering controls limitation.  Thus, accepting Toro's argument that the steering controls limitation is inherently incorporated into the "entire body" limitation would render the explicit steering controls limitation in claims 1, 20, and 26 superfluous.

**2.    A claim construction of the "entire body" limitation that precludes steering controls attached to the chassis impermissibly imports a limitation from the specification**

In making its convoluted non-infringement argument, Toro impermissibly imports a limitation from the specification – that steering controls must be attached to the platform – into three claims that make no claim to steering controls whatsoever, let alone how such unclaimed steering controls are attached to the vehicle.  While claim terms are understood in light of the specification, a claim construction *must not* import limitations from the specification into the claims. *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed. Cir. 2012); *see also Golight, Inc. v. Wal-Mart Stores, Inc.*, 355 F.3d 1327, 1331 (Fed. Cir.

---

[3] Claim 26 does not use this precise language, but claims a similar configuration: "left and right steering control levers that are mounted on and move with the operator platform."

2004)("While claims must be construed in light of the specification, limitations from the specification are not to be read into the claims. [internal citations omitted]").

This Court has expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment. *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004); *Golight*, 355 F.3d at 1331 ("[W]e have outright rejected the notion that disclosure of a single embodiment necessarily limits the claims."); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002)("[T]he number of embodiments disclosed in the specification is not determinative of the meaning of disputed claim terms.").

In other words, even if the specification describes only a single embodiment – which it does not in this case – the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction. *Liebel-Flarsheim*, 358 F.3d at 906; *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1372 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 719, 190 L. Ed. 2d 463 (2014). Despite the clear prohibition of reading limitations into the claims, that is precisely what Toro urges this Court to do.

In *ScriptPro LLC v. Innovation Assocs., Inc.*, 2016 WL 4269920 (Fed. Cir. Aug. 15, 2016), this Court rejected a defendant's attempt to limit the claim to a specific embodiment disclosed in the specification, holding that "a specification's focus on one particular embodiment or purpose cannot limit the described invention where that specification expressly contemplates other embodiments or purposes." *ScriptPro*, at *4.  Here, the '475 patent makes clear that the particular mower configuration described in the patent is merely a preferred embodiment of the invention, "given by way of illustration and not limitation," and notes that "[t]he drawings illustrate a preferred exemplary embodiment of the invention as incorporated into a self-propelled, ride-on mower 5."  (Appx043; 3:10-14 and 3:58-60)  In the Summary of the Invention section, the specification explains the desirability of isolating "*at least some* of the controls from the rigid chassis of the ride on mower" and indicates that the "steering controls *may* be mounted on the suspended platform."  (Appx042, 2:36-41) [emphasis added]  Other references in the specification of the '475 patent also establish that what is shown is merely a preferred embodiment:

- Each isolation mount 65 of *this embodiment* is a so-called "five to one" mount that is 5 times more compliant horizontally than vertically. (Appx043, 5:62-64)

- Referring now to FIGS. 2-4 and 9, spring/shock system 140 of *this embodiment* has a mono-shock configuration and is provided toward the back of the suspension system 100. (Appx043, 6:31-32)

- In *the present embodiment*, the linkage system 105 takes the form of a parallelogram linkage system. (Appx043, 6:40-43)

- In *the present embodiment,* this adjustment is performed using a course adjuster in the form of a collar-like cam 156 that . . . (Appx043, 8:38-39)

Toro mischaracterizes the '475 patent in stating that "all 11 figures are different views of Fig. 1, which is described as 'the present invention,'" (Toro Appeal Brief at 38). However, the '475 patent actually explains that "Fig. 1 is an isometric view of a ride-on mower incorporating a suspended operator platform *in accordance with the present invention*." (Appx042, 3:25-27) [emphasis added] Thus, the patent does not describe the preferred embodiment shown in Figs. 1-11 as "the present invention" as Toro claims – it discloses an embodiment that is consistent with ("in accordance with") the teachings of the present invention.

In attempting to make its claim that the steering controls must be mounted on the operator platform, Toro also impermissibly conflates "supporting the entire body of the operator" with "isolating the operator from shock loads." "Shock Loads" are defined by the '475 patent as, "vibrations, or shock-type or other loads,

can transmit through the ride-on mower chassis, foot rest, seat, and controls, and into the legs, bodies, and arms of the operators." (Appx041, 1:18-24). The '475 patent distinguishes between "support" and "shock loads" as follows:

> Referring again to FIGS. 1 and 2, *suspension system 100 is* ***configured to support an entire body of the operator****, the operator platform 70, and the components attached to the operator platform 70 such as steering controls 55. A combined weight of all of these defines* ***a sprung weight that is supported*** *by the suspension system 100*. Substantially the rest of the mower 5 is considered "rigid" or defines an unsprung weight of the mower 5, whereby the chassis 10, the mower deck 20, and the engine 40, are not supported by the suspension system 100. Such components of the mower 5 that are not supported by the suspension system 100 are generally represented by the subassembly of major mower 5 components seen on the right side of FIG. 2. *This configuration of suspension system* 100 *enhances operator comfort by* ***isolating the entire operator****, including the operator's hands and feet,* ***from shock loads****.* Isolating the mower deck 20 from the suspension system 100 prevents scalping that could otherwise occur if the mower deck 20 were to move with the suspension system 100 during a breaking operation.

(Appx043 6:7-25)

Toro seems to argue that in order to satisfy the "entire body" limitation, the suspended operator platform must isolate the entire body from all shock loads.

However, when the inventors wanted to refer to isolating the operator from shock loads, they used that or similar language.  When they wanted to convey the notion that the *weight* of something was supported they used the word "support."

For example, in addition to the paragraph quoted above, claim 5 calls for, "at least one elastomeric *isolation mount* connecting the seat to the operator platform to *reduce transmission of vibrations* therebetween" while claim 6 requires, "at least one *isolation mount* connecting the seat to the operator platform and *reducing transmission of vibrations* therebetween." In contrast, asserted claim 11 requires "a chassis that *supports* a drive train" and "an operator platform that *supports* the seat."  (Appx046) [emphasis added]

The asserted claims, 11, 14, and 21, make no mention of isolating the body from shock loads, and that isolation is hardly the only purpose or advantage of the '475 patent.  Among other things, as mentioned above, the claimed invention provides a linkage system that "permits the operator platform to swing fore and aft as a unit while preventing any side to side movement and/or any pitching or yawing movement."  (Appx041, 2:65-67)

As discussed above, the specification explains that in one embodiment the operator platform "isolates *at least some* controls from the rigid chassis" and that the steering controls "*may* be mounted on the suspended platform" meaning that some or all of the controls, including the steering controls, may be mounted

somewhere other than to the suspended operator platform, such as to the rigid

chassis. (Appx041, 2:37-41) [emphasis added] Thus, the '475 patent contemplates

embodiments where the suspended operator platform supports the entire body of

the operator, yet some or all of the controls are mounted to the rigid chassis (e.g.,

the deck adjustment lever), the operation of which may expose the operator to

some shock loads.

Toro's support/isolation argument is further undermined by its own

advertising that describes the suspended operator platform of Toro's own

lawnmowers, where the steering controls are mounted to the chassis, as "isolating

the operator from the rest of the machine." (Appx541, 20 second mark) This is an

admission by Toro that an operator may be "isolated" in a configuration such as

Toro's lawnmowers, where the steering controls are mounted to the chassis and not

to the suspended operator platform.

As discussed *supra*, there are several aspects of the invention that improve

over the prior art, including a linkage assembly that reduces undesirable movement

of the operator platform and a stiffness adjuster for adjusting the stiffness of the

suspension system. Other identified aspects of the invention include, "an

operator's seat [that] is vibrationally isolated from a suspended operator platform

by a system of elastomeric isolation mount" (Appx042, 3:1-4), "an operator

stiffness adjuster that permits a seated operator to adjust the stiffness of the

suspensions system" (Appx041, 2:55-62), and "a coil over shock [that] is aligned longitudinally and/or transversely with a center of gravity of a sprung weight of the mower."  (Appx042, 3:5-7)

"An inventor may include subcombination claims that are drawn to just one aspect or combination of elements so long as that combination has a utility separate and apart from other aspects or elements of the invention as a whole." *Penda Corp. v. United States*, 29 Fed. Cl. 533, 555 (1993).  For example, claim 27 of the '475 patent is a method claim directed principally to the ability of the operator to adjust the suspension while "upon the ride-mower."  And while Toro asserts that the claims must include the steering controls of the sole embodiment allegedly disclosed, it is tellingly not advocating for the inclusion of the disclosed elastomeric isolation mounts (claimed in various dependent claims) nor the alignment of a coil over shock aligned longitudinally or transversely with the center of gravity of the sprung weight of the mower (not claimed at all) which are both identified as "aspects of the invention."

## II.    The district court properly found that Toro failed to raise a substantial question as to infringement

Toro's only non-infringement argument on appeal is that its lawnmowers do not include a suspended operator platform that "supports… an entire body of an operator during use of the utility vehicle," a limitation required by claims 11, 14 and 21.  In challenging the district court's claim construction, which is reviewed *de*

*novo* here, Toro does not even attempt to conduct a proper infringement analysis. The district court properly conducted this analysis, construing the "entire body" limitation and finding that Toro's lawnmowers satisfy the limitation.

While Toro is dissatisfied with the district court's entry of the preliminary injunction, at the district court level, Toro did not attempt to actually construe the "entire body" limitation. Instead, Toro appears to have worked backwards from the (false) premise that the operator platform cannot be found to support the entire body of the operator in a system where steering controls are mounted to the chassis (as they are in Toro's lawnmowers).

Toro's approach ignored (and continues to ignore) the bedrock legal principle that claims are construed in view of the claims, the specification, the prior art, and the prosecution history (not of record at this stage in the proceedings) – *not* in view of the accused device, as Toro is doing here. *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985). Aside from the impropriety of failing to conduct a proper infringement analysis, Toro's attempt to escape infringement fails for several reasons.

The district court did not abuse its discretion when it applied its construction to Toro's lawnmowers holding that "the fact that the defendants' lawnmowers have steering controls attached to the chassis, as opposed to the operator platform, is not a defense to infringement." (Appx012) There is no clear error here, as Toro has

failed to identify any evidence suggesting Toro's operator platform does not support the entire body of the operator as would an ordinary chair.

Toro's lawnmowers clearly infringe because the suspended operator platform supports what the '475 patent describes as a certain "sprung weight," which includes the weight of entire body of the operator. For example, Toro's promotional videos show various operators sitting on the operator platform without having their hands or arms supported by anything other than the operator platform. One example is shown below. Indeed, Toro has never asserted that the suspended operator platform cannot support an operator's entire body without some additional assistance.



(Appx541)

Toro repeatedly asserts that "it is undisputed that Toro's accused mower platform does not support the operator's hands and arms." *See, e.g.,* Toro Appeal Brief at 24 and 29. However, Scag never conceded this was true and Toro points to nothing that justifies this claim. In fact, Scag specifically contested this argument in its response to Toro's Motion for a Stay (Doc. 21) at 9.

Toro repeats this same claim with respect to the district court's preliminary injunction decision pointing to a sentence in the district court's grant of the preliminary injunction which reads, "All of the accused mowers have steering controls connected to the chassis, not the suspended operator platform, which means that the platform does not support the rider's arms and hands." (Appx010) However, this sentence is merely part of the court's summary of the positions taken by each party and was not a finding of fact. (See the court's decision denying Toro's motion to stay and motion to dismiss, (Appx021), in which the court states, "Defendants argued that the accused mowers do not infringe because they have steering controls connected to the chassis, not the suspended operator platform, which means that the platform does not support the rider's arms and hands. Judge Randa disagreed . . .").

Toro relies on the mere fact that its steering controls are not connected to the operator platform to support its non-infringement claim. However, there is no evidence in the record that stands for the proposition that Toro's steering controls

support an operator's hands and arms.  There is nothing in any declaration nor anything in the '475 patent that supports this position.  Even if there were such evidence, that would not preclude Toro from infringing the '475 patent.  This is because even if the steering controls do provide some support for an operator's hands and arms at some point, there is no evidence that the suspended operator platform does not support the entire body of the operator, including the hands and arms.  In fact, there is ample evidence to the contrary.

For example, Toro's own videos show an operator beginning to use Toro's accused mowers by sitting on the operator platform and performing numerous adjustments prior to engaging the steering controls.



(Appx540)



*Id.*



(Appx541)

Toro's manuals describe various use practices that evidence periods of time

when the operator is not engaged with the steering controls. (Appx132, Appx134,

Appx136, Appx137, Appx215-217) Examples are shown below.

**Releasing the Parking Brake**



Figure 13

**Disengaging the Blade-Control Switch (PTO)**



Figure 15

## Operating the Throttle

The throttle control can be moved between Fast and Slow positions (Figure 16).

Always use the Fast position when turning on the mower deck with the blade-control switch (PTO).



Figure 16

Finally, as can be readily seen, Toro's accused mowers (and the mower embodiment disclosed in the '475 patent) all include two armrests. *See* video still images above, *see also* Appx031-032, Appx034-035. If the steering controls provided support as Toro claims, there would be no need for such arm rests and Toro would almost certainly not include such superfluous structure.

Still further, the '475 patent indicates that the embodiment shown in the figures is "configured as a zero-turn lawnmower." (Appx042, 3:66-67). However, there is nothing in the patent or any of the evidence of record that precludes the

claimed invention from being used in conjunction with mowers or light utility vehicles with steering systems that are not configured as zero-turn lawnmowers.  In fact, Toro itself saw fit to provide the district court a picture of a light utility vehicle with a conventional steering wheel in its response to Scag's Preliminary Injunction Motion at p. 4 and again in its motion to dismiss the complaint at p. 7 (Appx319)  Thus, even if the zero-turn lawnmower steering controls shown in the '475 patent do provide some support for the hands and arms at some point (a fact not in evidence), there is nothing that precludes the use of a different type of steering controls that do not support the hands and arms of the operator during use.

Toro's reliance on the configuration of the steering controls on its lawnmowers is not a defense to infringement.  The mere addition of an element or step to an accused product cannot avoid infringement.  *Vectra Fitness, Inc. v. Icon Health & Fitness, Inc.*, 272 F. Supp. 2d 1164, 1169 (W.D. Wash. 2003), *citing Vulcan Eng'g Co., Inc. v. Fata Aluminium, Inc.*, 278 F.3d 1366, 1375–76 (Fed. Cir. 2002) ("[W]hen all of the claimed features are present in the accused system, the use of additional features does not avoid infringement."); *Amstar Corp. v. Envirotech Corp.*, 730 F.2d 1476, 1482 (Fed. Cir. 1984) ("Modification by mere addition of elements or functions, whenever made, cannot negate infringement without disregard of the long-established, hornbook law ..."); *A.B. Dick Co. v. Burroughs Corp.*, 713 F.2d 700, 703 (Fed. Cir. 1983) ("It is fundamental that one

cannot avoid infringement merely by adding elements if each element recited in the claims is found in the accused device ....").

Thus, as the district court correctly held, Toro cannot avoid infringement by mounting steering controls to the chassis where the operator platform unquestionably supports the entire body of the operator.  Toro recognizes this in its brief when discussing invalidity.  Toro Appeal Brief at 54 ("the addition of elements in the prior art does not avoid anticipation just as the addition of elements in an accused device does not avoid infringement").

## III.    The district court properly found that Toro failed to raise a substantial question as to invalidity

Toro takes issue with the district court's findings of fact and conclusions of law disposing of Toro's invalidity argument, arguing that "[t]he district court dismissed Toro's substantial question of validity in two short paragraphs."  Toro Appeal Brief at 26.  Toro overlooks the fact that it only presented six paragraphs of argument as to invalidity in opposing Scag's preliminary injunction motion, without offering any supporting declarations from technical experts or other fact witnesses.  The district court should hardly be criticized for rejecting such an undeveloped and unsupported argument without substantial discussion.

Toro further argues that the district court reached its invalidity decision without claim construction or findings of fact, Toro Appeal Brief at 29-30, yet Toro did not propose or request a claim construction proceeding in connection with

its invalidity argument, did not itself propose an actual claim construction, did not present any evidence upon which the district court could make factual findings other than the two prior art patents, and did not request an evidentiary hearing. Toro merely submitted the two prior art references, i.e., Henriksson and Sasaki, along with conclusory, unsupported attorney argument. Conspicuously absent from Toro's invalidity argument is any prior art relating to riding lawnmowers or light utility vehicles. Thus, from the outset, Toro presented the district court with scant evidence as to invalidity. Nevertheless, in the course of its opinion, the district court engaged in claim construction, made numerous factual findings, and weighed all the evidence presented by the parties.

The district court correctly found that Henriksson is not an anticipatory reference, explaining that "Henriksson… discloses a heavy-duty truck with a driver's compartment, not an operator platform as described by claims 11 and 14." (Appx013) This finding is not clear error based upon Henriksson's disclosure of a "driver's compartment" that includes "front," "rear," and two "side" vertical walls in addition to a "bottom wall," which starkly contrasts with the operator platform of a riding lawnmower disclosed in the '475 patent. (Appx403, Appx407, 2:8-61) There is also the matter of the radical difference in the use and size of Henriksson, which describes the disclosed configuration as "a propelling vehicle for a load

carrying trailer," with a wheel that is as tall as and wider than the entire driver's compartment.   (Appx403, Appx405, Appx407, 2:9-14)



The district court reasoned that because Henriksson did not disclose an operator platform as claimed, it was not an anticipatory reference.  Consistent with the distinction drawn by the district court, Toro itself recognizes that light utility vehicles are in a different class than automobiles and other larger vehicles stating:

> Ride-on lawn mowers and other off-road light utility vehicles generally employ a "rigid chassis," meaning the vehicle chassis does not have a suspension system. This is in contrast to a car, where the chassis is usually suspended from the wheels, often by shock absorbers and/or springs. Ride-on mowers typically do not have a car-type suspension because those suspensions

> are complex, expensive, and require substantial maintenance.
> They also reduce cutting performance.

Toro Brief at 15 (internal citations omitted). The heavy-duty vehicle of Henriksson is even further afield.

It is Toro's burden to present a *prima facie* case for invalidity. *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1339 (Fed. Cir. 2003) (When the presumptions and burdens applicable at trial are taken into account, the injunction should not issue if the party opposing the injunction raises a substantial question concerning infringement or validity, meaning that it asserts a defense that the party seeking the injunction cannot prove lacks substantial merit). Toro failed to meet this burden at the preliminary injunction stage.

The district court also rejected Toro's claim 21 obviousness argument, which is based upon a combination of Henriksson and Sasaki, a Japanese patent for a motorcycle shock absorber. Toro offered Sasaki along with an English translation. (Appx413-428) However, Toro did not provide any indication of the source of the translation nor any certification as to its accuracy, thus raising serious questions about its evidentiary value.

The district court held that Toro "offer[s] no reason, and the Court cannot imagine one, that a person of ordinary skill in this field would combine a motorcycle shock with a suspended truck cab and come up with a suspended

operator platform." (Appx012)  Such a finding makes sense.  A heavy-duty

vehicle, with a wheel the size of a person, is not a likely candidate for the inclusion

of an adjustable shock absorber used on a lightweight, two-wheeled vehicle.  This

is the kind of appropriate and reasonable fact-finding engaged in by the court that

Toro claims the district court failed to do.  Instead, it is Toro that failed to satisfy

its burden as to invalidity.

## IV.    There are alternate grounds for affirming the district court's finding that Toro failed to present a substantial question as to validity

Because the district court rejected Toro's argument that the entire driver's

compartment constituted an operator's platform as claimed in the '475 patent, the

district court did not need to further examine Toro's anticipation argument.

However, as alternate grounds for affirmance, Henriksson fails to disclose several

other required elements of claims 11 and 14, while the combination of Henriksson

and Sasaki likewise does not render missing elements of claim 21 obvious.

For example, both claims 11 and 14 require a chassis that supports a drive

train.  Henriksson makes no mention of a drive train, let alone an enabling

description of how a drive train may be supported within the vehicle.  Toro glosses

over this limitation, labeling the "supporting wheel 1" as the drive train in its claim

chart.  Toro Appeal Brief at 52.  A wheel is not a drive train and Henriksson does

not indicate whether the disclosed wheel is a drive wheel or a driven idle wheel.

Henriksson fails to disclose this limitation of claims 11 and 14, and therefore is not anticipatory.

Claims 11 and 14 both also require "a seat" and "an operator platform that supports the seat and an entire body of an operator during use of the utility vehicle." However, despite Toro's placement of a seat into its drawing of Henriksson, no seat is actually disclosed. Moreover, Henriksson is silent as to the manner in which an operator (and any seat) would be supported.

Claim 14 further specifies how the linkage system is connected to the chassis. For example, claim 14 requires a linkage system "connecting the rear portion of the operator platform to the rear portion of the chassis." To the extent the rear wall of the driver's compartment is considered part of the operator platform – which it should not be – the linkage connects the rear wall to the chassis near the front wheel of the vehicle, not at a rear portion of the chassis – which is not shown or described in Henriksson. Thus, Henriksson does not disclose the linkage configuration of claim 14 and is not anticipatory.

Claim 21 requires a chassis that supports a mower deck. While Toro asserts claim 21 is obvious over Henriksson and Sasaki, neither discloses a mower deck. As it did with the district court, Toro again glosses over a claim limitation, asserting in a claim chart, without any evidentiary support, that "[i]t would have been an obvious design choice to have that vehicle comprise a riding mower with a

mower deck." Toro Brief at 57. While Toro does not specify what it means by

"that vehicle," Toro must either be arguing that it would have been obvious to fit

the heavy-duty vehicle of Henriksson with a mower deck, or to fit the motorcycle

of Sasaki with a mower deck, neither of which makes any sense. There is nothing

in either Henriksson or Sasaki suggesting that the technology disclosed therein is

applicable to a riding lawnmower. Toro engages in impermissible hindsight

analysis. In addition to the missing limitation of a mower deck, Toro has failed to

demonstrate that these references are analogous art for purposes of an obviousness

analysis.

**V.    The district court did not abuse its discretion in finding irreparable harm to Scag, balancing the hardships of Scag and Toro, or evaluating the public interest**

In claiming Scag is not being irreparably harmed by Toro's activities, Toro

criticizes the time it took Scag to bring its infringement claims and preliminary

injunction motion. In doing so, Toro improperly relies on so-called facts that are

nowhere in evidence. Toro variably claims that Scag was aware of Toro's

suspended operator platform for "almost one year" or "10 months," asserting that

"Scag does not dispute that it was aware of Toro's mowers shortly after their

launch in July of 2015," citing to the district court's Preliminary Injunction

Decision and Order at Appx016. Toro Appeal Brief at 63-64.

However, the district court's opinion makes no finding that Scag knew about the design of Toro's suspended operator platform in July 2015 and in fact, specifically states that "Scag first saw a lawnmower equipped with Toro's MyRide suspension system on October 22, 2015" – more than three months later. (Appx016)  Moreover, in analyzing the time it took Scag to bring its preliminary injunction motion, the court specifically found that the time lag was reasonable under the circumstances and noted that it would be improper to penalize Scag for doing its due diligence prior to filing suit.  *Id.*  Toro's claims of unreasonable delay are unfounded and its claims of a ten-month delay are not supported by any evidence.[4]

Toro also claims that Scag's harm can be addressed by money damages. However, as the district court found, Scag's harm is far more than that. Customers within the commercial lawnmower market (which is an umbrella over the suspended operating platform lawnmower market) tend to be very brand loyal. (Appx015)  In other words, when a customer purchases an infringing suspended platform lawnmower from Toro, they are likely to remain a Toro or Exmark customer with respect to future purchases.  As noted by the district court, Toro's own declaration backs up this very claim, stating that some customers "prefer to

---

[4] While a supporting declaration includes a copy of a Toro press release dated July of 2015, the declaration does *not* state that Scag had any knowledge of the press release or Toro's suspended operator platform at that time.

purchase an entire line of products from the same manufacturer for consistency, such as common look, common parts, and common warranty." (Appx432, Appx435). Thus, Scag will suffer irreparable harm because it is not only losing out on a sale (which would be compensable with money damages), it is losing out on a potential lifetime, loyal customer of the entire line of Scag products (the value of which is not quantifiable with money damages). (Appx015)

Toro further argues that the district court improperly relied upon *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142 (Fed. Cir. 2011), because that case addresses a permanent injunction. *Robert Bosch* held that requiring the patentee to compete against its own patented invention places a substantial hardship on the patentee. *Robert Bosch*, 659 F.3d at 1156. But this Court has cited *Robert Bosch* when considering a preliminary injunction. *See Celgard, LLC v. LG Chem, Ltd.*, 624 F. App'x 748, 752 (Fed. Cir. 2015). Thus, Toro's complaint is not well taken.

Finally, as to the public interest, the district court held that "[t]he public can continue obtaining the patented suspension system from Scag, or it can obtain other non-infringing mowers from the defendants." (Appx016). Toro does not challenge this conclusion.

However, for the first time, Toro now argues that it attempted to design around the '475 patent. However, Toro did not present this argument to the district court, nor did it submit any evidence supporting this claim. As such, Toro's

unsubstantiated design-around claim does not factor into the analysis.   Thus, the

injunction does not contravene the public interest.

## VI.   The district court complied with Rule 65(d)(1)(C)

Toro argues that the injunction is "overly broad" because it does not "list[]

the claims infringed, which products Toro is enjoined from making, using, or

selling, nor the configuration that is the basis of the decision."  Toro Appeal Brief

at 65.  Thus, Toro seems to be challenging whether the district court's Decision

and Order complies with Rule 65(d)(1)(C), which requires that every order

granting an injunction "describe in reasonable detail – and not by referring to the

complaint or other document – the act or acts restrained or required."  However,

other than the vague complaint stated above, Toro offers no explanation or analysis

of the purported deficiencies in the district court's 12-page Decision and Order

(Appx006-017).

Despite Toro's undeveloped argument to the contrary, the district court's

Decision and Order clearly satisfies Rule 65(d)(1)(C).  In its Decision and Order,

the district court explains that "[Scag] moves for a preliminary injunction

precluding The Toro Company and Exmark Manufacturing Co., Inc., from making,

using, selling and offering to sell lawnmowers equipped with platform suspension

systems that infringe Scag's patent, U.S. Patent No. 8,186,475."  (Appx006)  "This

motion is granted on the condition that Scag posts adequate security."  *Id*.

In the Background section of the opinion, the district court identifies the Exmark and Toro lawnmowers having the suspended operator platforms at issue. Specifically, the district court states that "[a] promotional video provides a demonstration of the Exmark suspended platform system." (Appx008) The district court identifies the Toro lawnmowers by the trademark Toro uses for those lawnmowers, i.e., MyRIDE™ suspension system, and also by referencing Toro's promotional video for lawnmowers with the MyRIDE™ suspension system. (Appx008-009) Further, to the extent it is required to identify which claims are infringed, the district court's decision and order clearly identifies claims 11, 14, and 21 as the claims at issue, and finds that "defendants failed to raise a substantial question on infringement" as to those claims. (Appx013) As such, Toro cannot credibly complain that it is unaware or not on notice of the models that are to be enjoined and the claims that those models are infringing.

The district court's Decision and Order (Appx006-017) identifies the patent and the claims that are infringed, the products that are the subject of the injunction, and the conduct from which defendants are enjoined, satisfying the requirements of Rule 65(d)(1)(C).

## Conclusion

The district court's Decision and Order granting the preliminary injunction should be affirmed.

Dated:  October 12, 2016

s/Michael T. Griggs
Michael T. Griggs
Adam L. Brookman
Sarah M. Wong
Boyle Fredrickson, S.C.
840 N. Plankinton Avenue
Milwaukee, WI 53203
(414) 225-9755

**Attorneys for Plaintiff-Appellee**
**Metalcraft of Mayville, Inc.**

## **Certificate of Compliance with Rule 32(a)**

1.    This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

  [X]    this brief contains 10,617 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

  [X]    this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2013 in Times New Roman size 14 font.


Date:  October 12, 2016                    s/ Michael T. Griggs
                                           Michael T. Griggs
                                           Adam L. Brookman
                                           Sarah M. Wong
                                           Boyle Fredrickson, S.C.
                                           840 N. Plankinton Avenue
                                           Milwaukee, WI 53203
                                           (414) 225-9755

                                           Attorneys for Plaintiff-Appellee
                                           Metalcraft of Mayville, Inc.

# CERTIFICATE OF SERVICE

I hereby certify that I caused the foregoing Response to be delivered via email on counsel for The Toro Company and Exmark Manufacturing Co., Inc. as follows:

Anthony R. Zeuli
Rachel C. Hughey
MERCHANT & GOULD PC
3200 IDS Center
80 South Eight Street
Minneapolis, MN 55402
tzeuli@merchantgould.com
rhughey@merchantgould.com

Date:  October 12, 2016

s/Michael T. Griggs
Michael T. Griggs
Counsel for Appellee